[No. F010075. Fifth Dist. Jan. 9, 1989.]

Conservatorship of the Person of ALFRED MARVIN WALKER.
DAVID M. HADDEN, as Public Guardian, etc., Petitioner and
Respondent, v.
ALFRED MARVIN WALKER, Objector and Appellant.

**COUNSEL**

Paul Bernstein for Objector and Appellant.

Max E. Robinson, County Counsel, and Anne Kinzel, Deputy County Counsel, for Petitioner and Respondent.

## OPINION

**THE COURT.**\*—Appellant Alfred Marvin Walker challenges an order reappointing respondent Fresno County Director of Health as conservator of his person pursuant to Welfare and Institutions Code[1] section 5361, and imposing certain special disabilities upon him pursuant to section 5357. Upon review, it appears the trial court properly reappointed respondent as appellant's conservator. However, no factual basis was specifically offered to support the disabilities imposed upon appellant. We will therefore remand the matter for further proceedings on the question of special disabilities.

### FACTS

In November 1986, respondent was named appellant's temporary conservator based upon a court finding that appellant was gravely disabled within the meaning of the Lanterman-Petris Short (LPS) Act in section 5008, subdivision (h)(1).[2]

Thereafter, the Fresno County Superior Court appointed respondent as appellant's conservator for the one-year period ending January 2, 1988. The court found appellant was gravely disabled due to a mental disorder and unable to provide for his personal needs for physical health, food, clothing or shelter. The court also made the following orders: "1. The conservator of the person shall place the conservatee in a psychiatric facility licensed by the State of California.

"2. The conservator of the person shall have the right to require the conservatee to receive treatment related specifically to remedying or preventing the recurrence of the conservatee's being gravely disabled.

---

\*Before Woolpert, Acting P. J., Best, J., and Stone (W. A.), J.

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Section 5008, subdivision (h)(1), provides:

"For purposes of Article 1 (commencing with Section 5150), Article 2 (commencing with Section 5200), and Article 4 (commencing with Section 5250) of Chapter 2 of this part, and for the purposes of Chapter 3 (commencing with Section 5350) of this part, 'gravely disabled' means:

"*(1) A condition in which a person, as a result of a mental disorder, is unable to provide for his basic needs for food, clothing, or shelter*; or . . . ." (Italics added.)

"3. The following disabilities are imposed on the conservatee:

"a. The conservatee shall not have the privilege of possessing a license to operate a motor vehicle.

"b. The conservatee shall not have the right to enter into any contracts.

"c. The conservatee shall not have the right to refuse treatment related specifically to the conservatee's being gravely disabled.

"d. Pursuant to Welfare and Institutions Code Section 8103(e), the conservatee shall not have the right to possess a firearm or any other deadly weapon."

In November 1987, respondent petitioned the trial court for reappointment as appellant's conservator by alleging appellant continued to be gravely disabled. In relevant part, respondent also alleged it was in the conservatee's best interests that he be deprived of the privilege of possessing a driver's license, the right to enter into contracts, and the right to possess a firearm or other deadly weapon.

At the hearing on the petition for reappointment, psychiatrist Paul Levy testified on behalf of respondent. Dr. Levy conducted a drug clinic at Fresno Care and Guidance Center where appellant had resided since August 1987. In that capacity, Dr. Levy became acquainted with appellant and frequently assessed the conservatee's mental condition. Dr. Levy most recently evaluated appellant's mental status five days before the instant hearing.

Dr. Levy diagnosed appellant as suffering, for over 20 years, from a schizophrenic condition of the paranoid type. The essential symptom of this condition was the presence of a fixed delusional system so that appellant felt: "[T]he staff at Fresno Care and Guidance Center is being paid off by the FBI to give him Drano and to give him kerosene so they could burn his stomach out, his feeling that for many years now, that the FBI has been after him, his story that the Mafia gave him—first he said one half million dollars, then he said the Mafia bought him a home in Kansas City but he didn't accept title to it."

Appellant expressed these feelings during the doctor's evaluation.

In the doctor's opinion, appellant was actively hallucinating at the present time. He presented a problem in terms of his behavior towards himself and society depending on the intensity of his paranoid feelings. With the

antipsychotic medication appellant took, he still had the paranoid delusions "but at least he [was] not agitated about them." Appellant was taking 40 milligrams a day of stelazine, which the doctor considered to be a "pretty good dose."

Dr. Levy believed appellant's condition continued to require 24-hour supervision. "He does not think he's ill. He does not think he needs treatment, he does not think he needs medication. I think if he were not under active supervision, he simply would refuse to be in treatment, refuse to take medication and then we would see a great deal of agitation and perhaps an acting out on the basis of his paranoid delusions."

Appellant, in the doctor's opinion, was not capable of making a commitment to follow a voluntary treatment plan because he did not think he was ill. As late as the most recent evaluation, appellant continued to maintain he was not ill nor did he need medication.

Dr. Levy stated appellant had the cognitive awareness to be able to provide for his food, clothing and shelter needs as long as he took his medication. However, because appellant did not think he was ill, he would not take his medication or seek treatment. Without the medication, appellant would become agitated so that he would be unable to take care of his own physical needs.

Appellant testified on his own behalf. Asked whether he would continue taking his medicine if he were no longer a conservatee, appellant replied: "Well, in six years, I lived in a foster home, and I took it every day, and I got it from the VA. And when I was out here to Perdue Street, I took it every day. When I lived in Aberdine, South Dakota, I took it every day."

When asked again by his counsel whether he would take his medication if he were released from the conservatorship, appellant stated: "Yeah, I've been taking it. You can call Dr. Mooney over here at the VA. And I was gonna tell you something else. If you want records of the FBI, you can ask me, you can get them at the VMC."

## DISCUSSION

### I.  GRAVELY DISABLED.

■  Appellant contends he was not "gravely disabled" at the time of trial and therefore the court should have denied the petition for reappointment. According to appellant, the court renewed the conservatorship because of the "likelihood" he would stop taking his medication if he were

released, and thus become gravely disabled in the future. Relying on *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030 [226 Cal.Rptr. 33], and *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15 [184 Cal.Rptr. 363], appellant argues a court may not grant reappointment because of the possibility that the conservatee would not take his or her medication if released.

The Third District, first in *Murphy* and later in *Benvenuto,* held if a conservatee is not presently gravely disabled, an LPS conservatorship could not be extended because of a perceived likelihood of future relapse. In both cases, doctors had testified the subject conservatees could manage their own affairs. However, the doctors added, if they were allowed to do so, they would likely regress and again become gravely disabled. *Benvenuto* and *Murphy* are factually distinguishable from the present case.

Here, Dr. Levy testified that appellant remained gravely disabled because he had *no insight* into his mental illness. He did not believe he was ill, nor did he believe he needed medication. The evidence was undisputed that without the medication, appellant could not provide for himself. Given the opportunity to dispute the statements that he lacked insight into his illness and would not take his medication if released, appellant could offer nothing more than his statement that he had taken the medicine before. Such testimony, however, did not controvert the doctor's opinion that appellant still needed 24-hour supervision. Indeed, the fact that appellant had been gravely disabled and committed in 1986 was evidence which the court could consider that appellant did *not* take his medication on a voluntary basis.

On appeal "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom. (*In re James D.* (1981) 116 Cal.App.3d 810, 813 [172 Cal.Rptr. 321].)

The order reappointing respondent as appellant's conservatee was supported by substantial evidence.

## II. SPECIAL DISABILITIES.

■ While respondent requested that the special disabilities previously imposed on appellant be continued for another year, the evidentiary basis to

support his request is unclear. Appellant contends respondent offered *no* evidence to support his request. Respondent responds by arguing: appellant has waived any issue related to the special disabilities order because he failed to offer any evidence on the subject. However, respondent overlooks his burden of producing evidence to support the special disabilities which he sought. He failed to even address the issue during the hearing. The fact that appellant continued to be gravely disabled did not by itself satisfy the evidentiary requirements for the imposition of special disabilities under section 5357.[3] A conservatee does not forfeit any legal right nor suffer legal disability by reason of the LPS commitment alone. (§ 5005.)

The trial court may have been satisfied by the content of the psychiatrist's testimony that the special disabilities were warranted. However, the basis for the court's order in this regard is unclear on this record. The better practice is for the conservator to disclose, by the questions asked or the argument made, the evidence relied upon to support special disabilities under section 5357.

■ Respondent also suggests that appellant has not exhausted his remedy under section 5358.3, and therefore should not be heard to argue this issue on appeal. Section 5358.3 provides: "At any time, a conservatee or any person on his behalf with the consent of the conservatee or his counsel, may petition the court for a hearing to contest the rights denied under Section 5357 or the powers granted to the conservator under Section 5358. However, after the filing of the first petition for hearing pursuant to this section, no further petition for rehearing shall be submitted for a period of six months.

---

[3] Section 5357 provides: "All conservators of the estate shall have the general powers specified in Chapter 6 (commencing with Section 2400) of Part 4 of Division 4 of the Probate Code and shall have such additional powers specified in Article II (commencing with Section 2590) of Chapter 6 of Part 4 of Division 4 of the Probate Code as the court may designate. The report shall set forth which, if any, of the additional powers it recommends. The report shall also recommend for or against the imposition of each of the following disabilities on the proposed conservatee: (a) The privilege of possessing a license to operate a motor vehicle. If the report recommends against this right and if the court follows the recommendation, the agency providing conservatorship investigation shall, upon the appointment of the conservator, so notify the Department of Motor Vehicles.

"(b) The right to enter into contracts. The officer may recommend against the person having the right to enter specified types of transactions or transactions in excess of specified money amounts.

"(c) The disqualification of the person from voting pursuant to Section 707.5 of the Elections Code.

"(d) The right to refuse or consent to treatment related specifically to the conservatee's being gravely disabled. The conservatee shall retain all rights specified in Section 5325.

"(e) The right to refuse or consent to other medical treatment unrelated to remedying or preventing the recurrence of the conservatee's being gravely disabled which is necessary for the treatment of an existing or continuing medical condition. The report shall include an evaluation of such condition and the current treatment for such condition, if any."

"A request for hearing pursuant to this section shall not affect the right of a conservatee to petition the court for a rehearing as to his status as a conservatee pursuant to Section 5364. A hearing pursuant to this section shall not include trial by jury. If a person's right to vote is restored, the court shall so notify the county clerk pursuant to Section 707.7(c) of the Elections Code."

There is nothing in this language which prevents a conservatee from seeking appellate review. Instead, section 5358.3 provides a forum for an evidentiary hearing which a conservatee may initiate to contest a previous order by presumably showing a change of circumstance. That is not the issue presented here.

The order reappointing conservator is affirmed. The matter is remanded for further proceedings concerning the special disabilities which respondent seeks to impose on appellant.

A petition for a rehearing was denied February 1, 1989.