Filed 10/21/13  Conservatorship of Lisa S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| Conservatorship of the Person of LISA S. | D063691 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. MH108236) |
| v. | |
| LISA S., | |
| Objector and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frederick Maguire, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Objector and Appellant.

Thomas E. Montgomery, County Counsel, and George Seikaly and Christina I. Vilaseca, Deputy County Counsel, for Petitioner and Respondent.

The trial court found Lisa S. to be gravely disabled under the Lanterman-Petris-Short Act (the LPS Act) (Welf. & Inst. Code, § 5000 et seq.),[1] imposed a one-year conservatorship over her, and determined the least restrictive placement for her was a closed, locked treatment facility. Lisa challenges the sufficiency of the evidence supporting the court's determination of her placement. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Lisa is a 52-year-old woman with a history of mental illness beginning in her late 30's or early 40's. She has not lived independently for the past five or six years. Since May 2007, Lisa has undergone at least 18 acute psychiatric hospitalizations in San Diego County, and an additional seven hospitalizations in other jurisdictions. Most recently, in November 2012, Lisa was admitted to Tri-City Medical Center's Behavioral Health Unit (Tri-City) after she called the sheriff's department and reported that she was assaulted and had not taken her medications in three days.

At Tri-City, Lisa was diagnosed with schizoaffective disorder, bipolar type. She was delusional and tangential, accusing the police of sexually molesting her and telling stories of having been beaten up by two black workers and placed in a hospital where she was tortured. During her medical examination, Lisa denied being herself and denied that her parents were her parents. Medical staff observed that she had severe, debilitating delusional thoughts, was perseverative, and had limited insight and judgment. Based on her delusional state, multiple prior hospitalizations, and lack of a plan to provide for her basic needs, Robert Zalewski-Zaragoza, M.D., of Tri-City referred Lisa for a conservatorship investigation. The referral

---

1    All further statutory references are to the Welfare and Institutions Code.

2

stated that Lisa "has had multiple admissions and when she leaves the hospital she ends up in another one . . . and she stops her medications."

On December 21, 2012, the Office of the Public Conservator filed a Petition for Appointment of Conservator of the Person and Temporary Conservator. The court appointed a temporary conservator that same day and set a hearing on the petition for January 31, 2013. At that hearing, the court received into evidence an investigation report submitted by the Office of the Public Conservator and heard live testimony from Dr. Zalewski-Zaragoza and Lisa. The court found beyond a reasonable doubt that Lisa's mental disorder rendered her gravely disabled under the LPS Act and, consequently, appointed a conservator over her for one year.

With regard to placement, Dr. Zalewski-Zaragoza testified that the least restrictive option was a closed, locked treatment facility. He provided the following explanation of why this was superior to a board and care facility:

> "The pattern has been of -- coming in the hospital, stabilizing, stopping meds, going somewhere else, and, again, getting readmitted again. [¶] We feel that -- getting some longer-term treatment for a while would be much better so that she can go back in the community eventually. [¶] . . . [¶] When she was at home, her parents were monitoring her medication. She would stop it. I don't believe the board and care has that much ability to make sure she takes the medications."

Dr. Zalewski-Zaragoza also explained to the court that although Lisa's condition had begun improving since her November 2012 hospitalization, she needed to remain in a closed, locked facility to break her cycle of improving during hospitalizations but becoming medication noncompliant shortly after discharge:

"The Court: Is your treatment plan essentially about getting her stabilized on medication?

3

"[Dr. Zalewski-Zaragoza]: It is. And a lot more stable than I believe she has been before. [¶] . . . [¶]

"The Court: [D]espite the improvement, she needs a greater period of stabilization so that she will be stable even when she is left to her own devices, yes?

"[Dr. Zalewski-Zaragoza]: Yes."

Contrary to Dr. Zalewski-Zaragoza's testimony and her medical history of becoming noncompliant with her medications, Lisa testified that she "do[es] not stop [her] medication." The court acknowledged this factual dispute and resolved it by concluding that placing Lisa in a closed, locked treatment facility was the least restrictive means of breaking her cycle of noncompliance:

> "And when you have this many hospitalizations, it only strikes me as reasonable that that tells me that the follow-up isn't -- either, one, there is not follow-up being done; or, two, the patient is released from the hospital too soon. And that happens sometimes because you want to be judicious; there is a requirement and things like that.
>
> "But these hospitalizations -- and there is kind of an in-and-out and a pattern to it. . . . [¶] But a doctor says, look, this poor woman has been getting treated for this thing on and off for the past several years. We just need to get her stable once and for all. That is what you need."

## DISCUSSION

While Lisa does not challenge the trial court's initial finding that she is gravely disabled under the LPS Act,[2] she contends insufficient evidence supports the court's conclusion that the

2    Although Lisa does not challenge the finding of grave disability in *this* appeal, she has a separate appeal pending in this court arising from a March 21, 2013, rehearing at which the court concluded that Lisa remained gravely disabled and that the least restrictive level of placement remained a closed, locked facility. In a separate opinion filed concurrently with this one, this court affirmed the judgment resulting from the rehearing.

4

least restrictive placement for her was a closed, locked treatment facility. We disagree and therefore affirm.

*General Legal Principles*

The LPS Act governs involuntary treatment of the mentally ill in California. (§ 5001.) A court may place a person under conservatorship for up to one year where she is gravely disabled and unwilling or unable to accept voluntary treatment. (§ 5350.) One is gravely disabled if she is presently unable to provide food, clothing, or shelter for herself. (§ 5008, subd. (h)(1)(A); *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15, 18.) The party seeking a conservatorship bears the burden of proving beyond a reasonable doubt that the proposed conservatee is gravely disabled. (*Baber v. Superior Court* (1980) 113 Cal.App.3d 955, 966.)

Upon a finding of grave disability, "[t]he court must separately determine . . . the level of placement appropriate for the conservatee." (*Conservatorship of Christopher A*. (2006) 139 Cal.App.4th 604, 612, citing §§ 5357 & 5358.) In doing so, "the court is to designate the least restrictive alternative placement for the conservatee." (*Conservatorship of Amanda B*. (2007) 149 Cal.App.4th 342, 351; § 5358, subd. (a)(1)(A).) Under subdivision (c)(1) of section 5358, "if the conservatee is not to be placed in his or her own home or the home of a relative, first priority shall be to placement in a suitable facility as close as possible to his or her home or the home of a relative. For purposes of this section, suitable facility means the least restrictive residential placement available and necessary to achieve the purpose of treatment." "The party

5

seeking conservatorship has the burden of producing evidence to support . . . the placement . . . ." (*Conservatorship of Christopher A*., at p. 612.)

We review a conservatee's challenge to the sufficiency of evidence under the substantial evidence standard of review. (*Conservatorship of Amanda B*., *supra*, 149 Cal.App.4th at pp. 347-348.) Evidence is substantial where it is reasonable, credible, and of solid value. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577.) The testimony of a single witness, or circumstantial evidence and the reasonable inferences drawn therefrom, may be sufficient to support such a finding. (*Ibid*.; *Conservatorship of Carol K*. (2010) 188 Cal.App.4th 123, 134.) We resolve all conflicts and draw all reasonable inferences in favor of upholding the judgment, if possible. (*Conservatorship of Amanda B*., at p. 350.)

*Sufficiency of the Evidence*

Lisa contends insufficient evidence supports the trial court's determination regarding Lisa's placement because the "evidence suggested the least restrictive placement for [her] was a board and care facility that would ensure she took her medication." We disagree.

The court heard testimony from Dr. Zalewski-Zaragoza, whom the parties stipulated was qualified to testify as an expert psychiatrist. He observed Lisa's well-documented pattern of frequently recurring hospitalizations due to her becoming noncompliant with her medications. Based on that history, he opined that a closed, locked treatment facility was the least restrictive means available to break that cycle for the long-term. Dr. Zalewski-Zaragoza also directly addressed Lisa's contention that a board and care facility would be more appropriate, concluding that such a facility does not have "that much ability to make sure she takes the medications." We find Dr. Zalewski-Zaragoza's testimony to be "reasonable,

6

credible, and of solid value"—in other words, substantial. (*Conservatorship of Walker*, *supra*, 206 Cal.App.3d at p. 1577.)

## DISPOSITION

The judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


McINTYRE, J.