Filed 7/31/14  P. v. Ramirez CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>JESSE RAMIREZ,<br><br>　　　　Defendant and Appellant. | A138461<br><br>(Alameda County<br>Super. Ct. No. 89-032231) |

Jesse Ramirez appeals an order of the trial court establishing a mental health conservatorship under the Lanterman-Petris-Short Act (Welf. & Inst. Code,[1] § 5000 et seq., 5350 et seq.) (the Murphy conservatorship).  He contends the evidence is insufficient to show he is gravely disabled for purposes of section 5008, subdivision (h)(1)(B), and that it does not support the orders requiring him to submit to treatment.  We shall reverse the order to the extent it grants the conservator authority to authorize routine medical treatment, and otherwise affirm.

## I.  MURPHY CONSERVATORSHIP

Pursuant to Penal Code section 1367, a criminal defendant who is mentally incompetent, that is, unable to understand the nature of the proceedings or assist counsel in the defense, cannot be tried.  Under our state's statutory scheme in such cases, "[a] defendant who, as a result of a mental disorder, is adjudged not competent to stand trial on a felony charge may be committed to a state hospital for no more than three years.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

([Pen. Code,] §§ 1367, subd. (b), 1370, subds. (a), (c); *People v. Karriker* (2007) 149 Cal.App.4th 763, 780 [(*Karriker*)].)  If, at the end of the three-year period, the medical staff determines there is no substantial likelihood the defendant will gain mental competence in the foreseeable future, the defendant must be returned to the court for further proceedings.  [Citations.]  The three-year period under section 1370, subdivisions (a) and (c), applies to the aggregate of all commitments for treatment for incompetence regarding the same charges.  [Citation].  [¶]  Once an incompetent defendant has been committed for the maximum commitment period, if it appears to the court that the defendant is 'gravely disabled,' the court shall order the conservatorship investigator to initiate a 'Murphy conservatorship.'  (*People v. Karriker*, *supra*, 149 Cal.App.4th at pp. 775–777, 781; see [Pen. Code,] § 1370, subd. (c)(2); Welf. & Inst. Code, § 5008, subd. (h)(1)(B).)  The court may impose a Murphy conservatorship if it finds the defendant, as a result of a mental disorder, ' "represents a substantial danger of physical harm to others." '  [Citations.]  Alternatively, the court can dismiss the charges and order the defendant released, without prejudice to the initiation of alternative commitment proceedings under the Lanterman-Petris-Short Act.  [Citations.]"  (*People v. Reynolds* (2011) 196 Cal.App.4th 801, 806, fn. omitted.)

Such a conservatorship automatically terminates after one year; if the conservator determines a conservatorship is still required at that point, the conservator may petition the superior court for reappointment for another one-year period.  (Welf. & Inst. Code, § 5361; *Karriker*, *supra*, 149 Cal.App.4th at p. 778.)

## II.  BACKGROUND

Ramirez was charged with three counts of arson:  two counts of arson in that he caused to be burned separate structures on Telegraph Avenue in Berkeley (Pen. Code, § 451, subd. (c)), and one count of arson of property of another in that he burned or caused to be burned property on Telegraph Avenue in Berkeley (Pen. Code, § 451, subd.

(d)).[2]  According to a report prepared by Ramirez's conservator, these events took place in 2006, and in 2007 Ramirez was found incompetent to stand trial and hospitalized at Napa State Hospital.  In 2008, the hospital concluded that, due to the cumulative effects of schizophrenia and brain damage, he remained incompetent to stand trial, and recommended a conservatorship.  In 2009, Ramirez was evaluated and found to be both incompetent and dangerous and placed on a Murphy conservatorship.  The conservatorship was renewed in 2010 and 2011.

The conservator sought reappointment in late 2012, shortly before the most recent conservatorship was due to expire.  The petition alleged that Ramirez had been examined by two practitioners who had determined he was still gravely disabled as a result of a mental disorder for purposes of section 5008, subdivision (h)(1)(B).  Ramirez stipulated that he remained incompetent pursuant to Penal Code section 1370 and that the indictment had not been dismissed.  At the time of the trial, he had been living at an unlocked board and care home for over two years.

A bench trial on the petition took place in March 2013.  Dr. Jennifer Kirkland, a psychologist who had evaluated Ramirez, testified as an expert.  Ramirez had been diagnosed with schizophrenia and cognitive disorder.

Dr. Kirkland described the "positive" and "negative" symptoms of schizophrenia. The positive symptoms are such things as hallucinations and delusions, and the negative symptoms include an impaired ability to express emotion, social withdrawal, difficulty maintaining routines, and a loss in day-do-day functioning, such as meals, sleep, and hygiene.  Ramirez's positive symptoms had improved significantly over the years, as he had been consistently medicated by means of injections, but he still showed signs of being "internally preoccupied" and made verbalizations that might be delusional.  Among his negative symptoms, he tended to stay up late and sleep through the day, he had difficulty holding down a volunteer job and a daily routine, and he would become

---

[2] The record on appeal does not contain the records of the underlying case.  This summary of the charges is based on statements made by the trial court, apparently while reviewing the charging document.

suspicious, withdrawn, belligerent, and threatening. When he received intensive encouragement from support staff his behavior improved, but without that support, he would revert to his earlier behavior patterns.

Ramirez had been receiving injectable forms of his medications because he had a history of failing to take pills voluntarily. He did not seem to see the correlation between his use of medication or his lifestyle and his improved mental status. He had stated consistently that he did not believe his medication was helpful and that he did not want to take it. However, when Dr. Kirkland met with Ramirez in November 2012, he said that in the past medications had controlled his psychotic symptoms, but that he did not have those symptoms now. In the past, Ramirez had not been consistent in receiving other mental health services, such as group support, and did not think he needed them.

Dr. Kirkland was of the opinion that Ramirez posed a substantial danger of physical harm to others as a result of his mental disorder. Due to his belligerence, he "needed a lot of limit setting in order to stay de-escalated," and he had some preoccupation with violence. He would gather grass, dandelions, and bushes, put them into a blender, and consume them; he filtered coffee through his underwear and sold it to other residents of his board and care facility, he sold cigarettes to residents at higher prices after hours, and he ran poker games. He had acted toward other residents of the board and care home in a threatening and agitated manner, which required intervention. Ramirez had a history of illegal substance abuse, which could exacerbate his mental health issues, make his medications less effective, and "trigger acting-out behavior that is dangerous." Even caffeine could make medications less effective, disrupt sleep, impair judgment, and increase agitation and belligerence. When Ramirez was in a prior placement, he would set fires. He also smoked in his room, which was considered a red flag for the re-emergence of arson-related behavior.

Ramirez had told Dr. Kirkland that if he were no longer under a conservatorship, he would decline services, go to a board and care home in Sacramento, and resume a relationship with a woman there. It appeared, however, that the woman in question was married and that Ramirez's interest in her might be one-sided. Dr. Kirkland noted that

4

Ramirez had no plan for ongoing treatment in Sacramento. In the absence of treatment, he would probably return to his previous pattern of substance abuse and the symptoms of his schizophrenia would return.

Dr. Kirkland acknowledged that Ramirez had been calm during his evaluation, even when asked about his problematic behaviors, and that the owner of the board and care facility was physically much smaller than Ramirez.

During cross-examination by Ramirez's counsel, Dr. Kirkland testified about a recent medical emergency. Ramirez was unable to breathe properly and was taken to the hospital. He refused treatment, and the owner of the board and care home was unable to reach the conservator in order to obtain her consent to the treatment on Ramirez's behalf.

Another psychologist who had evaluated Ramirez, Dr. Charles Meyers, also testified as an expert. He opined that Ramirez suffered from a severe mental disorder, and that he had been diagnosed with schizophrenia, disorganized type, which was in partial remission as a result of the antipsychotic medication that the staff at his board and care home insisted he take. Ramirez had also been diagnosed with polysubstance abuse, which was in "institutional remission," and cognitive disorder, not otherwise specified, due to head injuries.

When Dr. Meyers evaluated Ramirez in October 2012, Ramirez exhibited evidence of a mental disorder, but to a lesser extent than when Dr. Meyers had examined him three years previously. He showed signs of paranoia, and thought the accusation against him was a plot, that people were "ganging up on him and saying things that were not true," and that the statements that he was mentally ill and needed medication were part of a plot. Ramirez said he was not mentally ill, that his medications were unnecessary, and that if he were free to follow his own wishes, he would stop taking them. One of the main reasons he wanted to end his conservatorship was his desire to stop taking medications, which made him tired.

Dr. Meyers discussed Ramirez's pending charges with him. In 2009, Ramirez had said the offense "was a response to persecution, that there were a group of people called Okies who were blue-eyed, blonde, and Italian and Russian, and he had set the fires to get

5

back at them and also to keep warm." During the 2012 evaluation, Ramirez told Dr. Meyers he set the fire to keep warm on a cold night.

Dr. Meyers opined that Ramirez continued to represent a substantial danger of physical harm to others. He based this conclusion on Ramirez's history, in combination with his stated intention to stop taking his medications if he had the opportunity. If he stopped his medications, Dr. Meyers believed, he would "again become volatile and exaggeratedly mentally ill, and . . . he will lose control that he now has," and would again act on his paranoid delusions.

Before testifying, Dr. Meyers had contacted the conservator to ask for an update. The conservator's office sent him a report, prepared in February 2013, which stated that Ramirez had been taken to the emergency room because he could not breathe properly. Ramirez had emphysema as a result of his smoking. He left the emergency room against medical advice, saying that he did not want treatment and that if he went to the hospital, he would not be able to smoke. The conservator was contacted to try to force Ramirez to return and receive treatment. Dr. Meyers also received accounts of the episode from the board and care home and from Ramirez's case manager.

Ramirez testified at trial. He first stated that he did not believe he was mentally ill, although he believed he was disabled because he did not have parents to support him and get him to work; he later said he did not "completely disagree" with his diagnosis because in the past he had heard voices telling him to do "things that were wrong." He testified that he had not heard voices recently, but went on to say that "sometimes some of these figures out they can talk to me in my head and they can bother me, and I don't know why," and that just a couple of days before the trial, "somebody was telling me to try to . . . do something wrong, . . . and I told them, 'No, just leave me alone.' I just said that, and they left me alone." When asked if he ever did what the voices asked, he described a time when he was in Sacramento and a voice told him to go back to Berkeley, "because I was growing hair on my back a little bit, so I wouldn't get raped and turn— and turn to a freak or something." After he got to Berkeley, he "got[] into trouble,

6

because there was somebody going around burning buildings and setting forests on fire and stuff, and I got blamed for it."

Ramirez did not think the medications he took helped him deal with the voices. He believed the medications were making his vision worse, were making him grow taller, and improved his vocabulary. He did not think he needed antipsychotic medication, and would not take it if he had the choice. He wanted the conservatorship to end because he wanted to go to Sacramento to see his girlfriend and see his mother and step-father. He said he and his girlfriend wanted to get married, but first he would have to divorce his current wife, whose last name he did not know. He had not seen his mother for about seven years. He would live in a board and care home. He said he would arrange to take his medication in Sacramento.

The trial court extended the Murphy conservatorship until December 2, 2013. As part of its ruling, the court ordered: "The conservator may require the conservatee to receive treatment related specifically to remedying or preventing the recurrence of the conservatee's grave disability, including giving consent to the use of psychotropic medications, and conservator has the authority to authorize routine medical treatment." This timely appeal ensued.[3]

### III.    DISCUSSION

#### A. Evidence That Ramirez Is Gravely Disabled

Ramirez first argues the record does not contain evidence that he is gravely disabled for purposes of section 5008, subdivision (h)(1)(B). Under that statutory provision, "gravely disabled" means "[a] condition in which a person, has been found mentally incompetent under Section 1370 of the Penal Code and all of the following facts exist: [¶] (i)  The indictment or information pending against the person at the time of commitment charges a felony involving death, great bodily harm, or a serious threat to

---

[3] The one-year extension of the conservatorship has by now expired, and the appeal is therefore technically moot. We shall nevertheless consider it on the merits because "it raises issues that are capable of recurring, yet evading review because of mootness." (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 161, fn. 2.)

7

the physical well-being of another person. [¶] (ii) The indictment or information has not been dismissed. [¶] (iii) As a result of a mental health disorder, the person is unable to understand the nature and purpose of the proceedings taken against him or her and to assist counsel in the conduct of his or her defense in a rational manner." In particular, Ramirez argues there is insufficient evidence that the felonies of which he is accused involve "death, great bodily harm, or a serious threat to the physical well-being of another person." He contends that arson may be committed without a serious threat of harm to a person's physical well-being, and that there is no evidence that such a threat in fact existed in connection with the crimes he is alleged to have committed. (See *People v. Baker* (2012) 204 Cal.App.4th 1234, 1246 [because inhabited structure may be temporarily unoccupied, conviction for arson of inhabited structure in violation of Penal Code section 451, subdivision (b) does not in itself prove arson posed substantial danger of physical harm to others].)

The procedural posture of this case leads us to reject Ramirez's contention. The petition before the trial court was not for an initial Murphy conservatorship, but a renewal of a conservatorship that had already been approved twice. In approving the conservatorship in 2009, the trial court necessarily found Ramirez "gravely disabled" for purposes of section 5008, subdivision (h)(1)(B). Some of the findings encompassed in that conclusion are subject to change, and hence are appropriately reexamined in subsequent conservatorship proceedings; for instance, whether the indictment has been dismissed and whether the defendant is able to participate in his or her own defense. (§ 5008, subd. (h)(1)(B)(ii) & (iii).) The question of whether the qualifying offense involves "death, bodily harm, or a serious threat to the physical well-being of another person," however, is incapable of change. (See *People v. Parham* (2003) 111 Cal.App.4th 1178, 1182 [in mentally disordered offender proceeding, applying collateral estoppel to question whether severe mental disorder was factor in commission of qualifying offense]; see also § 5008, subd. (h)(1)(B)(i).)

Applying this rule, the court in *People v. Lopez* (2006) 146 Cal.App.4th 1263, 1276, concluded a person who had been committed under the Sexually Violent Predators

Act (SVPA) (§ 6600 et seq.) could be precluded by the doctrine of collateral estoppel in a subsequent SVPA proceeding from relitigating the issue of whether his or her conviction constituted a " 'sexually violent offense against two or more victims.' " In doing so, the court explained that "[c]ollateral estoppel applies when the following requirements are met: ' " 'First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' " ' " *Lopez*, 146 Cal.App.4th at p. 1273.)

These authorities lead us to conclude that once the question of whether the charged offense involved death, great bodily harm, or a serious threat to the physical well-being of another person has been litigated and decided in an initial proceeding to establish a Murphy conservatorship, the doctrine of collateral estoppel bars it from being relitigated. Indeed, Ramirez concedes as much in his reply brief. He argues, however, that there is no evidence that in the original conservatorship proceedings, the trial court applied the proper burden of proof, which he asserts is proof beyond a reasonable doubt that the charged offense met the standards of section 5008, subdivision (h)(1)(B)(i). We recognize that the party asserting a collateral estoppel has the burden to prove it. (*Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1482.) It is well established, however, that a trial court is presumed to have followed the applicable law (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956), and Ramirez makes no attempt to show that the trial court that made the initial conservatorship findings failed to do so. On the particular facts of this case—in which the original court must necessarily have found the charged offense met the statutory standards, and in which there is no showing whatsoever that it failed to perform its duty—we agree with the Attorney General that Ramirez is barred from relitigating this point.

9

## B. Scope of Conservator's Authority

Section 5358, subdivision (b) provides:  A conservator shall . . . have the right, if specified in the court order, to require his or her conservatee to receive treatment related specifically to remedying or preventing the recurrence of the conservatee's being gravely disabled, or to require his or her conservatee to receive routine medical treatment unrelated to remedying or preventing the recurrence of the conservatee's being gravely disabled.  Except in emergency cases in which the conservatee faces loss of life or serious bodily injury, no surgery shall be performed upon the conservatee without the conservatee's prior consent or a court order obtained pursuant to section 5358.2 specifically authorizing that surgery."

Ramirez contends the evidence does not support the trial court's grant of authority to require him to submit either to routine medical care unrelated to his grave disability or to care related to that disability.  As he points out, the conservator had the burden to produce evidence to support any special disabilities imposed on Ramirez. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577–1578.)  As explained in *Conservatorship of George H.*, *supra*, 169 Cal.App.4th at p. 165, " 'If a person is found gravely disabled and a conservatorship is established, the conservatee does not forfeit legal rights or suffer legal disabilities merely by virtue of the disability.  [Citations.]  The court must separately determine the duties and powers of the conservator, the disabilities imposed on the conservatee, and the level of placement appropriate for the conservatee. [Citations.]  The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal.' "

The evidence is ample to support the order authorizing the conservator to "require the conservatee to receive treatment related specifically to remedying or preventing the recurrence of the conservatee's grave disability, including giving consent to the use of psychotropic medications."  There was evidence that Ramirez lacked insight into his mental illness, that his illness had improved under medication, but that it would return in the absence of psychotropic medications, that he did not believe his medications were

10

helpful or necessary, and that he had said that if the conservatorship were ended, he would stop taking his medications. On these facts, the trial court could reasonably authorize the conservator to require mental health treatment.[4]

We reach a different conclusion as to the trial court's order granting the conservator authority to authorize routine medical treatment. The only evidence supporting this portion of the order was the evidence that Ramirez had suffered an emergency when he could not breathe properly and he refused necessary treatment.[5] The evidence at trial showed that the conservator would have been able to authorize emergency medical treatment in that situation, and the Attorney General does not argue otherwise. (See *K.G. v. Meredith* (2012) 204 Cal.App.4th 164, 170 [in absence of court order imposing disabilities or an emergency, conservator may not require conservatee to receive medical treatment].) Nothing in the record shows that Ramirez—particularly in the relatively stable mental condition he appears to be in—is unable to manage his own routine medical care. Such evidence may exist, and if so, nothing we say is intended to prevent it from being raised in any subsequent petitions to reappoint the conservator. On this record, however, we conclude the evidence does not support the trial court's order insofar as it concerns Ramirez's routine medical treatment.

---

[4] We reject Ramirez's contention, unsupported by citation to authority, that the order denies him his constitutional right to equal protection. (See *Horowitz v. Noble* (1978) 79 Cal.App.3d 120, 139 [court may treat as waived argument lacking citation to authority].)

[5] Ramirez's counsel elicited testimony about this incident from Dr. Kirkland on cross-examination. Dr. Meyers provided a more detailed narrative about this incident, to which Ramirez objected on the ground it constituted inadmissible hearsay. On appeal, Ramirez again contends Dr. Meyers's testimony about this incident was inadmissible. We would reach the same conclusion whether or not we considered the disputed evidence.

## IV. DISPOSITION

The judgment is reversed to the extent it grants the conservator authority to authorize routine medical treatment.  In all other respects, the judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

12