Filed 9/3/21  Conservatorship and Estate of N.B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| Conservatorship of the Person and Estate of N.B. | C093553 |
| YOLO COUNTY PUBLIC GUARDIAN,<br><br>Petitioner and Respondent,<br><br>v.<br><br>N.B.,<br><br>Objector and Appellant. | (Super. Ct. No. MH20200147) |

Objector and appellant N.B. appeals from a judgment imposing a conservatorship on her under the Lanterman-Petris-Short Act (LPS or LPS Act) pursuant to Welfare and Institutions Code section 5350 et seq.  (Statutory section citations that follow are to the Welfare and Institutions Code unless otherwise stated.)  She challenges several special disabilities imposed by the trial court under section 5357, as well as additional powers

1

granted to the conservator under Probate Code section 2591.  To the extent she failed to object below, she argues ineffective assistance of counsel.

We conclude sufficient evidence supports the imposition of the challenged disabilities, and that a subsequent court order withdrew the powers originally granted to the conservator under Probate Code section 2591, thereby rendering her challenge to the additional powers moot.  We affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

N.B. has a long history of mental health issues.  She has been on two prior LPS conservatorships with the Yolo County Public Guardian (Public Guardian) from February 26, 2010, to March 12, 2012, (case No. LPSQ 10-014) and from August 12, 2012, to January 3, 2020 (case No. MH 2012-042).  Although she was stable and treatment compliant at the end of each of these past conservatorships, once the conservatorships expired, she began refusing treatment and had increased symptomology and hospitalizations.

On November 18, 2020, Dr. Alok Banga, a psychiatrist at Sierra Vista Hospital, referred N.B. for LPS conservatorship after she was admitted to the hospital.  In his opinion, N.B. was gravely disabled as a result of a mental disorder that prevented her from providing for her basic personal needs for food, clothing or shelter.  Because N.B. was not aware of the nature of her grave disability, she was unable to understand the benefits, risks, and alternatives to treatment, and was not able to understand, or knowingly and intelligently evaluate the information necessary to provide informed consent.  Dr. Banga thus recommended that various decisional disabilities be imposed on N.B., including that she not retain the right to refuse or consent to treatment related specifically to her being gravely disabled, the right to refuse or consent to routine medical treatment unrelated to remedying or preventing the recurrence of her being gravely disabled, the privilege of possessing a license to operate a motor vehicle, the right to

enter into contracts, the right to vote, and that she should not be allowed to possess firearms or other deadly weapons.

According to Dr. Banga's conservatorship referral, N.B. had been diagnosed with chronic paranoid schizophrenia. After her previous conservatorship terminated in January 2020, she was placed at Psynergy Vista de Robles (Psynergy) for continued mental health treatment. Yolo County Behavioral Health reported that she began refusing certain medications, which led to a substantial increase in symptomology; N.B. suffered from accusatory and bizarre delusions towards staff and refused to engage in the program.

In May 2020, she was hospitalized for three weeks at Aurora Santa Rosa Hospital. She continued to decompensate and visited the emergency room two times during the summer and early fall. After visiting the emergency room on October 14, 2020, N.B. refused to return to Psynergy and a missing persons report was filed. N.B. was later located, reassessed at the emergency room, and admitted to Sierra Vista Hospital on October 29, 2020. N.B. was placed on a section 5150 hold, which was later certified for an additional 14-day hold under section 5250.

At the hospital, N.B. suffered from worsening delusional thoughts and a fixed delusion that she was pregnant. She also believed that Psynergy staff were raping and shooting her at night, which was found not to be true. After examining N.B., the attending psychiatrist reported that N.B. remained paranoid, suffered from bizarre and accusatory delusions, was internally preoccupied, had disorganized thought processes and displayed bizarre posture. N.B. reported auditory hallucinations and reported that she could hear her unborn child.

On November 25, 2020, the Public Guardian filed a petition for a temporary conservator to be appointed for N.B.'s person and estate. The petition alleged N.B. was gravely disabled under section 5008, and was unwilling or incapable of accepting treatment voluntarily. The petition requested, among other things, that a conservator

have the right to place N.B. in a state-licensed facility or other nonmedical facility as provided in section 5358, and that a conservator be granted the power to require N.B. to receive routine medical treatment related to remedying or preventing the recurrence of her grave disability, including administering psychotropic medications. Pursuant to section 5357, the petition requested that N.B. be denied the same rights and privileges previously recommended by Dr. Banga, but that N.B. should retain the right to vote.

A hearing on the conservatorship petition was set in December 2020. Prior to the hearing, the court issued an order appointing the Public Guardian as the temporary conservator of N.B.'s person and estate. N.B. was appointed counsel, and she requested a court trial.

At trial in February 2021, Dr. Alison Steffensen, a clinical psychologist at Yolo County Health and Human Services (HHS) testified as an expert on grave disability for purposes of the conservatorship. Dr. Steffensen had met with N.B. between 10 and 15 times over the last six or seven years, and had been a witness in N.B.'s past conservatorship trials.

Dr. Steffensen recently evaluated N.B.'s mental health, and reviewed her mental health records, the Public Guardian records, the Psynergy records and several years of records from HHS. Dr. Steffensen spoke with several professionals involved in N.B.'s care, including her social worker and the Public Guardian.

In Dr. Steffensen's opinion, N.B. suffered from schizoaffective disorder, which was a mix between a mood disorder and a psychotic disorder. Her primary symptoms were psychotic in nature, such as hallucinations and bizarre delusions, false beliefs and disorganization. When not doing well, N.B. also exhibited mood symptoms such as anxiety and mania. At times, N.B. would uncontrollably wail and scream hysterically; she believed she had been and was being raped, that she was pregnant, that the food she ate would harm or kill her, and that there were gunshots outside her room. Other times, she would do quite well; N.B. was educated, helpful, and a talented musician and artist.

The primary issue, according to Dr. Steffensen, was N.B.'s lack of insight into her mental health problems. N.B. believed she has anxiety and amnesia, rather than a true mental illness that will require lifelong medication. She is not motivated to take medication when she is not legally obligated to do so. When she takes her medication, N.B. does well, but when she discontinues her medication, her psychotic and mood disorder symptoms increase. This lack of insight and failure to take medication has recurred throughout her illness.

Although Dr. Steffensen has discussed the medications with N.B., N.B. believed her medication was helpful for anxiety, but did not understand that her medication was necessary to control her delusions and hallucinations. She had told Dr. Steffensen that if she gets off of conservatorship, she will not take her medications. While Dr. Steffensen expected N.B. to testify that she would take her medication if she was not placed under a conservatorship, Dr. Steffensen did not believe her given her lack of insight and history of stopping her medications.

N.B. was conserved in February 2010. That conservatorship terminated in March 2012, when her treatment team decided to give her a chance to see if she would take her medications on her own. N.B. chose to forego her medications and decompensated; she was hospitalized and referred for a conservatorship again in August 2012. That conservatorship was terminated in January 2020, after her treatment team decided to let the conservatorship expire to give N.B. another chance to live independently; at the time, N.B. was medication compliant and said she would stay on her medication and remain at Psynergy, the facility where she was living and doing well. By April 2020, N.B. was hospitalized because she had stopped taking her medication as promised. She continued to not be treatment compliant and was hospitalized again the following month. She was hospitalized again in October 2020, which ultimately led to the current conservatorship referral, and she was discharged from Psynergy because her needs were too great for its staff to meet.

5

When asked about N.B's plans if she was not conserved, Dr. Steffensen believed N.B. could list jobs for which she could apply, and was aware of her social security income (SSI), probably knew how to cook, and could likely go to a grocery store, but her schizoaffective disorder interfered with her ability to carry out those everyday tasks if not on medication. When off her medication, N.B. fails to dress appropriately for the weather, and has had food delusions and previously stopped eating because she believed she was being poisoned or that food was a living thing that she could not harm, which lead to being hospitalized. N.B. also had heard voices telling her to kill herself so that she could be reincarnated.

Dr. Steffensen testified that N.B. would likely have a difficult time finding housing because she has delusions about being raped and would likely accuse a neighbor of raping her. She had a history of calling to report that her service providers had raped her. As an example, Dr. Steffensen cited an incident at the beginning of N.B.'s illness where she lost an internship at a law firm because she developed a delusion that an attorney in the office was raping her.

In Dr. Steffensen's opinion, if N.B. were not placed under conservatorship, she would stop taking her medications, her symptoms would increase, and she would be hospitalized again. She opined N.B. was unable to provide food, clothing or shelter for herself as a result of her mental illness, and that she was gravely disabled.

The court questioned Dr. Steffensen whether, in her opinion, N.B. would be unable to meet her basic needs if not conserved because she lacked insight into her illness and would not take her medication as needed. Dr. Steffensen agreed. Even when on her medication, Dr. Steffensen testified that N.B. lacked insight into her illness. If she continued to take her medication, she would be able to take care of herself.

When asked about N.B.'s medication compliance when she was off the conservatorship in January 2020, Dr. Steffensen testified that she did not know the exact details but did know that N.B. at times had completely refused to take her medication.

6

On cross-examination, Dr. Steffensen testified that if N.B. were not conserved, she would still receive services from HHS for her mental illness. Yolo County, however, could not secure an appropriate living facility for her if she were not conserved, and she would likely end up at a shelter or hospitalized again. While she might cooperate to pick up her medication, once N.B. was home alone Dr. Steffensen did not believe should would take the medication.

When asked if a facility called Safe Harbor could serve as a transitional housing facility for N.B., Dr. Steffensen said no. Dr. Steffensen explained that Safe Harbor was a crisis facility that was not appropriate as a transitional housing facility for N.B. She had already placed N.B. on a section 5150 hold in 2014 at Safe Harbor because N.B. had wandered into traffic and asked a truck driver to run her over.

On redirect, Dr. Steffensen testified that when N.B.'s conservatorship terminated while she was at Psynergy in January 2020, Mental Health was still following her, but even that level of attention was not sufficient to keep her on her medications and out of the psychiatric hospital. Even though she was currently medication compliant while under the temporary conservatorship, N.B. still tried to get her doctors to reduce her medication.

N.B. testified that if not conserved she had a plan to address her food, clothing, and shelter needs. She claimed to have plenty of money to cover food, rent, and clothing as well as art supplies using her SSI and social security disability income, which was provided to her via her payee, Seth. N.B. also created art pieces that she sometimes sold to other patients for vending machine money.

N.B. would cook for herself and denied having any current problems with food. She testified she was "not someone who is going to starve myself. Not anymore, at least." N.B. planned to obtain clothing from various online retailers. She listed several places in Davis that she might live if discharged from the conservatorship. One location was across the street from the police station, which made her feel safe.

7

N.B. testified that she had a mental illness. When asked to explain her understanding of her mental illness, N.B. stated: "My understanding is that other people think I'm schizophrenic because I talk to myself and they think that I have delusions. I do indeed talk to myself because I pray on a daily basis." She then testified that she was an amnesiac, which made it difficult for her to remember the previous day's meals. When asked whether she needed medication, N.B. testified that she did because she had medications for insomnia, for clear thinking, and for amnesia. She said she would probably have any prescriptions filled by mail, or go to the pharmacy and pick them up.

She claimed she was hospitalized in October because she did not take her medication one time. She testified she refused the medication so she would get out of Psynergy because she was undiagnosed and untreated for several different medical conditions.

When asked about her delusions about gunshots, N.B. responded that she sleeps through a lot given her sedating pills, and that one time she woke up with a sedation stick in her back and a doctor was holding a bloody scalpel. She testified she might have erroneously believed the doctor was cutting a bullet out of her back, but she could not see it herself since it was on her back.

N.B. swore to the court that she would take her medication if not conserved. She said she liked the medication she was taking in the hospital because it stopped her insomnia and helped with her amnesia, and she promised she would continue taking the same medication if released.

N.B. testified that if she thought she was being raped, it was only because she had great pain from untreated hemorrhoids. Once her hemorrhoids had been treated, her pain subsided. She claimed her boyfriend in law school raped her by sodomizing her two times, and her physical health issues started afterwards. She claimed her law school internship simply ended at the end of her summer, and that she did not lose the job because of a rape delusion. N.B. admitted having problems with food earlier, but denied

8

she still felt that food would be harmed if she ate it.  She denied ever telling anyone that voices in her head told her to kill herself to be reincarnated.

On cross-examination, she admitted refusing two medications at the hospital on two occasions.  While she conceded that she promised to take her medication in January 2020 when her second conservatorship ended, she admitted that she had refused to take the medication one time.  When questioned why her records showed she actually refused medication three times, N.B. said that in April it was because she had a fibroid that was causing clotting and cramping.  In response to county counsel's follow-up question of whether she was sent to a psychiatric hospital because of the clotting and cramping, N.B. testified:  "Actually, you should know a little bit about Shannon Templeton, my boss.  She was a little bit upset at me because I was teaching some groups that she hadn't approved of me teaching, and she was going a little bit crazy on us, the people that know me and knew me well knew I'd be safe from her in a psych setting where she couldn't get in to hurt me.  Do you understand that at all?"

At the conclusion of trial, the court found beyond a reasonable doubt that N.B. was gravely disabled and that she suffered from a mental disorder that made her unable to provide food, clothing, and shelter.  The court signed a written order on February 5, 2021 (February Order), appointing the Public Guardian conservator of the person and estate of N.B., finding that all facts alleged in the petition were true, that N.B. was gravely disabled as a result of a mental disorder, that she was unwilling or incapable of accepting treatment voluntarily, that no suitable alternative to conservatorship was available, and that the least restrictive placement suitable to meet her needs was a locked psychiatric facility.

The February Order denied N.B. the following rights and privilege under section 5357:  (1) the privilege of possessing a license to operate a motor vehicle; (2) the right to enter into a contract; (3) the right to possess firearms or other deadly weapons; and (4) the right to refuse treatment related specifically to the conservatee's being gravely

9

disabled, including the administration of psychotropic medications. She retained her rights to vote and refuse or consent to routine medical treatment unrelated to remedying or preventing the recurrence of her being gravely disabled. It also granted the conservator all of the additional powers listed in Probate Code section 2591. N.B. timely appealed.

In April 2021, while N.B.'s appeal was pending, the parties stipulated to amend the court's February Order. We granted respondent's motion to augment the record with several documents filed after the court issued the February Order, including the parties stipulation to amend the February Order, county counsel's motion to amend, and the amended order appointing conservator, which was issued in April 2021.

Upon further review of the matter, the parties agreed that the Public Guardian need not be given *all* powers under Probate Code section 2591 as originally granted, and they requested that the court vacate paragraph 7 of the February Order granting such powers.

Counsel for the Public Guardian then moved to supplement and amend the February Order. The court signed an amended order on April 27, 2021 (April Order), and issued amended letters of conservatorship.

In the April Order, the court found, among other things, that based on the testimony of Dr. Steffensen and N.B., the facts alleged in the petition were true and that N.B. was gravely disabled. The court found that N.B. had an extensive psychiatric history of suffering from schizoaffective disorder and required medication to treat the symptoms of her disorder, including delusions and thoughts others wish to harm her. N.B. lacked insight into her illness and for the need to use medication to treat her symptoms. Without medication, N.B.'s symptoms increased, exacerbating her delusional thoughts, lack of insight, lack of capacity and ability to understand the nature of her illness, thereby increasing the risks incumbent from her illness.

Pursuant to section 5357, the court denied N.B. the privilege of possessing a license to operate a motor vehicle, "given the risk of harm based upon the findings

referenced above." She was also denied the right to enter into a contract except for under limited circumstances, based on the same findings. According to the April Order, N.B. was permitted to sell her artwork if: (1) she notified the Public Guardian's office of each sale and the amount of each sale, within 14 days of the sale; (2) the total amount of all sales did not exceed $50 per month; (3) the facility where she was placed permitted her to sell her artwork; and (4) buyers of her artwork had the capacity to contract. Furthermore, she was required to notify the Public Guardian within three days of taking a job for which she received compensation in order to ensure that she did not jeopardize her social security eligibility. The Public Guardian had no duty to account for the funds N.B. earned from selling her artwork.

N.B. was denied the right to possess firearms or other deadly weapons, given a lifetime ban under section 8103, subdivision (f)(I)(B). She was also denied the right to refuse treatment related specifically to her being gravely disabled, including the administration of psychotropic medications. As before, N.B. retained the right to refuse or consent to routine medical treatment unrelated to remedying or preventing the recurrence of her being gravely disabled, and the right to vote.

The Public Guardian was granted the power to require N.B. to receive treatment related specifically to remedying or preventing the recurrence of her being gravely disabled, including the administration of psychotropic medications. The reference to granting the conservator all of the additional powers listed in Probate Code section 2591 was deleted from the amended April Order.

DISCUSSION

I

*General Legal Framework*

The LPS Act is a civil commitment scheme that provides for short-term detention of mentally disordered individuals. (§ 5000 et seq.) An LPS Act conservatorship may be

11

established for any person who is gravely disabled as a result of a mental disorder. (§ 5350.) "Gravely disabled" is defined, in pertinent part, as "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).) "[A] person is not 'gravely disabled' if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic personal needs for food, clothing, or shelter." (§ 5350, subd. (e)(1).) "Grave disability must be proven beyond a reasonable doubt to establish and to renew LPS conservatorships." (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 696.)

If a court finds a person is gravely disabled and imposes a conservatorship, the conservatee does not automatically forfeit legal rights or suffer legal disabilities merely by virtue of the disability. (§ 5005; *Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1578 (*Walker*).) "The court must separately determine the duties and powers of the conservator, the disabilities imposed on the conservatee, and the level of placement appropriate for the conservatee. (§§ 5357, 5358.) The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal." (*In re Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612.)

II

*The Special Disabilities*

N.B. does not challenge the court's grave disability finding, but instead challenges three special disabilities imposed by the trial court, including the right to possess a firearm or other dangerous weapon, the privilege to possess a driver's license, and the right to enter into contracts. Because the Public Guardian did not present "specific" evidence about the requested disabilities nor did the expert witness who testified at the

hearing speak to the appropriateness of imposing the disabilities, she contends insufficient evidence supports the trial court's imposition of these three disabilities. We disagree.

We find nothing in the law that requires the Public Guardian to address specifically each requested legal disability, present evidence specific to that disability or specifically to argue in favor of it. Because there is no legal requirement that the court state the reasons for each order, the usual rules of appeal apply; thus, we presume in favor of the judgment the findings of fact necessary to support the judgment if supported by the record. (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165 (*George H.*).)

N.B. relies on *Walker, supra*, 206 Cal.App.3d at page 1578 for the proposition that there must be evidence offered on each of the petition's requests for disabilities specifically. We disagree with that holding. The better view, we believe, is stated in *George H.*'s holding that it is sufficient if the evidence presented during the hearing as a whole supports the court's judgment, including its decision on the request for specific disabilities. (*George H., supra*, 169 Cal.App.4th at p. 165.)

In this case, the court entered the amended April Order finding N.B. was gravely disabled and ordered the disabilities "[a]fter examining the petition . . . and hearing the evidence and testimony of Dr. Alison Steffensen and the conservatee . . ." Thus, the court was aware of the petition's request for an order of disabilities, heard the evidence establishing that N.B. was gravely disabled and the reasons therefor, and entered the order regarding specific disabilities. Given that, it is sufficient if the record as a whole supports the court's order regarding disabilities. We hold that it does.

The amended April Order denied N.B. the right to possess a firearm or other deadly weapons under section 5357 "given the lifetime ban" under section 8103, subdivision (f)(1)(B).

Section 8103, subdivision (f) provides in relevant part: "(1)(A) A person who has been (i) taken into custody as provided in Section 5150 because that person is a danger to

13

himself, herself, or to others, (ii) assessed within the meaning of Section 5151, and (iii) admitted to a designated facility within the meaning of Sections 5151 and 5152 because that person is a danger to himself, herself, or others, shall not own, possess, control, receive, or purchase, or attempt to own, possess, control, receive, or purchase, any firearm for a period of five years after the person is released from the facility.  [¶]  (B) A person who has been taken into custody, assessed, and admitted as specified in subparagraph (A), and who was previously taken into custody, assessed, and admitted as specified in subparagraph (A) one or more times within a period of one year preceding the most recent admittance, shall not own, possess, control, receive, or purchase, or attempt to own, possess, control, receive, or purchase, any firearm for the remainder of his or her life."

The record shows N.B. has an extensive psychiatric history and two prior LPS conservatorships.  Each time the conservatorship ended, she refused to take her medication and quickly decompensated, requiring multiple hospitalizations and a 5150 hold.  Substantial evidence supports imposing the lifetime firearm disability.

While the court originally denied her all rights to contract, the amended April Order limited her right to contract except for selling her artwork under prescribed conditions.  The Public Guardian's expert witness, Dr. Steffensen, provided evidence that N.B. suffers from schizophrenia and schizoaffective disorder.  She testified that N.B. has no insight into her illness and will not take medication off conservatorship.  N.B. herself testified that while others believed she was schizophrenic, she believed she only suffered from amnesia and insomnia.  While conserved, Dr. Steffensen explained that N.B. continued to argue with her treating doctor regarding recommended medication, showing a lack of insight into her illness and the need for lifelong medication.

As a result of her mental illness, N.B. suffers from chronic, perseverative symptoms, including hallucinations, delusions, and false beliefs.  Dr. Steffensen characterized these as extreme, and said they often result from N.B.'s delusional belief

14

that others are attempting to harm her, and specifically rape or shoot her. Without medication, the symptoms greatly increase and eventually lead to hospitalization.

N.B.'s delusions have also resulted in hearing voices telling her to kill herself so she can be reincarnated. Previously, she was placed on a section 5150 hold because she wandered onto a busy street and asked a truck driver to run her over.

The evidence amply demonstrates that N.B. remains delusional and is gravely disabled and is susceptible to undue influence. These facts support the disability precluding her from entering into contracts except for limited circumstances related to selling her artwork at the facility where she is housed. The evidence further shows that, given her delusions, she would likely be a danger to herself and others if she were allowed to drive a car or possess firearms. The trial court did not err in imposing the disabilities for possessing a firearm or deadly weapon, possessing a driver's license, or limiting N.B.'s right to contract.

III

*Additional Powers under Probate Code Section 2591*

N.B. contends the trial court erred in granting the conservator all powers listed in Probate Code section 2591. Given the court's amended April Order, this issue is moot.

While the court's original February Order granted the conservator "**all** of the additional powers listed in Probate Code section 2591," the parties subsequently stipulated, based on further discussion and review of the file and N.B.'s estate, that such powers were not necessary to manage her estate. The parties therefore requested that the court vacate the paragraph in the original February Order granting the conservator all additional powers under Probate Code section 2591. The court's amended April Order deleted any reference to those powers as the parties requested. Thus, the conservator no longer has all of the additional powers listed in Probate Code section 2591, rendering N.B.'s challenge to that provision moot. (*In re Karen G.* (2004) 121 Cal.App.4th 1384,

15

1390 [appellate courts are authorized to consider post-judgment evidence to determine whether an appeal is moot].)

DISPOSITION

The judgment is affirmed.

_____

HULL, J.

We concur:

_____

BLEASE, Acting P. J.

_____

KRAUSE, J.