Filed 9/6/22  Conservatorship of A.R. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Conservatorship of the Person of A.R. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY,<br><br>        Petitioner and Respondent,<br><br>v.<br>A.R.,<br><br>        Objector and Appellant. | A163629<br><br>(Contra Costa County<br>    Super. Ct. No. P21-00228) |

A.R. appeals from an order of conservatorship under the Lanterman-Petris-Short Act (LPS).  (Welf. & Inst. Code, § 5350.)[1]  Following a bench trial, the court expressly found he was gravely disabled and, on the basis of additional findings removed his rights to make medical decisions regarding his grave disability, drive, enter into contracts, and possess a gun.  A.R. maintains the grave disability finding must be reversed because the court erred in admitting into evidence certain entries in his medical records that he contends are inadmissible hearsay.  He further asserts no substantial evidence supports the court's disability determinations.

---

[1]  All further undesignated statutory references are to the Welfare and Institutions Code.

We affirm.

## BACKGROUND

The Public Guardian of Contra Costa County (Public Guardian) filed a petition to conserve A.R. in March 2021.[2] The probate court appointed the Public Guardian as A.R.'s temporary conservator that day and empowered the Public Guardian to place A.R. in a locked facility and make medication and treatment decisions on his behalf.

At the trial six months later, the only witness was Jennifer Weinstein, Psy.D., a clinical psychologist who testified as an expert in psychology and grave disability. Dr. Weinstein interviewed A.R. at the Villa Fairmont, the facility where he was placed, in August 2021. She also reviewed A.R.'s medical records from Villa Fairmont (Exhibit 4), Fremont Hospital (Exhibit 2), and John George, a psychiatric inpatient facility in Alameda (Exhibit 3), and she relied on those records in forming her opinions.

Dr. Weinstein diagnosed A.R. with schizophrenia. She explained schizophrenia is a psychotic disorder characterized by "perceptual disturbances which are symptoms that we call delusions and hallucinations."

---

[2] "The Lanterman–Petris–Short Act . . . , Welfare and Institutions Code sections 5000 et seq., governs involuntary treatment of the mentally ill in California. Under the Act, 'A conservator of the person, of the estate, or of the person and the estate may be appointed for any person who is gravely disabled as a result of mental disorder. . . .' (§ 5350.) 'Gravely disabled' is defined. It means, 'A condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter. . .' (§ 5008, subd. (h)) with the additional proviso that 'a person is not "gravely disabled" if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic personal needs for food, clothing, or shelter' (§ 5350, subd. (e)(1))." (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 159–160 (*George H.*).)

Delusions are "beliefs that don't match with reality." Other symptoms are lack of motivation, lack of speech, and social isolation. Schizophrenia is a chronic condition that will not go away but can be managed with medication and other therapies.

A.R. was taking a monthly injectable medication to treat his schizophrenia, which required administration by a medical professional. Dr. Weinstein testified the drug reduced his symptoms of schizophrenia.

When Dr. Weinstein interviewed A.R., he was aware of his name and the date. However, he did not know what city he was in, who the president was, or why he was in the hospital. A.R. told Dr. Weinstein that "he suspected somebody called and lied," resulting in his hospitalization. He also had what Dr. Weinstein characterized as a "delusion" that taking medication would cause him to be more prone to taking illegal drugs. Dr. Weinstein testified A.R. also had "thought blocking," which is a "symptom of schizophrenia wherein an individual stops [the] main thought or appears to have a thought, starts to express the thought and then stops."

A.R. told Dr. Weinstein he did not have a mental illness and did not need psychiatric treatment or medication. He reported a list of prior placements, including state hospital, institutes for mental disease, and various dual diagnosis drug and alcohol treatment programs.

A.R. also said that if not conserved, he would not take his medication unless forced. He had no plan to connect with psychiatric care providers in the community. He did not know where he would live and had no plan to find housing other than to rely on a case manager.

The court admitted A.R.'s medical records from Fremont Hospital, Alameda Health Systems, and Villa Fairmont, as business records. (Exhibits 2, 3, 4.) It also allowed Dr. Weinstein to testify about entries in these records

3

on which she based her opinion, but not about diagnoses set forth in the records.

Dr. Weinstein testified Fremont Hospital records stated A.R. had a "[d]isorganized thought process," "part of what we see as a cognitive impairment in those with schizophrenia." The records also stated A.R. had "thought blocking" and "auditory hallucinations," and exhibited "[i]nternal preoccupation," which Dr. Weinstein testified were also symptoms of schizophrenia. The records also stated A.R. refused medication and treatment on numerous occasions.

The Fremont Hospital records also described an incident in which A.R. was released from the facility after refusing to remain voluntarily. The record stated, " 'After discharging this patient, the patient went outside. The patient was so confused. He has no idea where he will go. He was sitting outside in the banquet. . . .' 'For the safety of the patient, the patient was brought back inside the hospital.' "

The Fremont records also contained reports of a number of physical attacks on staff and other patients. On one occasion, A.R. " 'was acting out and fighting [with] physician. Physical hold initiated.' " Other records stated he, on one occasion, was "swinging, spitting, and trying to bite at the staff," on another occasion attacked a patient, and on yet another occasion, threatened and " 'lunged' " at staff, whereupon he was physically restrained " 'to prevent any injuries.' "

Dr. Weinstein testified that in considering whether an individual has a grave disability, she considers whether he or she has "difficulty controlling aggressive impulses." She opined A.R.'s "trouble controlling his aggression . . . [was] one of his impairments related to his diagnosis of schizophrenia."

4

The ability to "maintain control over their physical aggression" is also necessary "in order to maintain stable housing."

The Alameda records included entries that A.R. had certain delusions. For example, he signed his hospital documentation with the name " 'James Peter Nelson,' " rather than his own name, and also reported his name was Peter. A.R. also told staff he " 'own[ed] a hotel I can stay at.' " Dr. Weinstein testified that identifying himself as another person and stating he owned a hotel were delusions, which are symptoms of schizophrenia.

The Villa Fairmont records included an entry about a July 2021 incident where A.R. was "agitated, spitting, and trashing [his] room" and his treating psychiatrist ordered emergency medication. The records also stated A.R. " 'expressed to the team that he is . . . never bad, and . . . a good person, and . . . [has] a perfect record. . . . [A.R.] denied having any mental health challenges or causing any problems.' "

Dr. Weinstein testified A.R.'s "schizophrenia impairs his perception[s] . . . resulting in auditory hallucinations, difficulty deciphering what's real and not real, resulting in paranoid concerns which correlate with . . . verbal aggression or physical aggression." She opined he was gravely disabled based on his lack of insight into his mental health disorder and symptoms, his inability to participate in meaningful treatment, and refusal to take medication.

The court expressly found beyond a reasonable doubt that A.R. was gravely disabled and his current placement was appropriate. The court also expressly found by clear and convincing evidence that four disabilities should be imposed: 1) the right to refuse treatment related to his grave disability, 2) the right to drive a vehicle, 3) the right to enter into contracts, and 4) the right to possess or own a firearm or other deadly weapon.

5

## DISCUSSION

*Medical Record Evidence*

A.R. maintains the trial court violated his due process rights by allowing Dr. Weinstein to testify about certain entries in his psychiatric records. He claims this evidence was inadmissible hearsay and lacked foundation.

The Public Guardian sought admission of A.R.'s psychiatric records from Fremont Hospital (Exhibit 2), Alameda Health Systems (Exhibit 3), and Villa Fairmont (Exhibit 4). Each set of records was submitted with a declaration of the custodian of records under Evidence Code section 1561. The trial court admitted the documents as business records under Evidence Code section 1271, but ruled it would not be "considering any specific diagnoses voiced by participants within the records. We'll go on an item-by-item basis with that stipulation." The court thus allowed Dr. Weinstein to testify about those portions of A.R.'s medical records on which she based her opinion, to the extent they recorded observations of A.R.'s statements and behavior, but not about opinions or diagnoses expressed by providers.

Under section 5008.2, the trier of fact is required to consider "the historical course of the person's mental disorder," including evidence from mental health or related support services and "*the patient's medical records as presented to the court, including psychiatric records*," in determining whether the person is gravely disabled for purposes of ordering a LPS conservatorship. (§ 5008.2, subd. (a), italics added.)

"The trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record; we will overturn its decision to admit such records only upon a clear showing of abuse." (*Conservatorship of S.A.* (2018) 25 Cal.App.5th 438, 447 (*S.A.*).) "The

6

business records exception requires a foundational showing that (1) the writing was made in the regular course of business; (2) at or near the time of the act, condition, or event; (3) the custodian or other qualified witness testifies to its identity and mode of preparation; and (4) the sources of information and mode and method and time of preparation indicate trustworthiness. (Evid. Code, § 1271. . . .) These requirements may be satisfied by affidavit. (Evid. Code, § 1561. . . .)" (*Ibid.*)

"In order for a record to be competent evidence under [Evidence Code section 1271] it must be a record of an act, condition or event; a conclusion is neither an act, condition or event. . . ." (*People v. Reyes* (1974) 12 Cal.3d 486, 503.) A psychiatrist's opinion about a patient's diagnosis is "not an act, condition or event within the meaning of the statute." (*Ibid.*)

A.R. claims the following three entries in the medical records constituted medical conclusions rather than observations: (1) a January 21, 2021, entry by Dr. Kumar stating A.R. was "internally preoccupied," (2) a February 6th entry by Dr. Kumar stating "on mental status exam . . . [A.R.'s] [t]hought process is disorganized with thought blocks. Hallucinations: [a]uditory type and internally preoccupied," and (3) a June 2nd entry by an occupational therapist that A.R. "appeared internally preoccupied" and "unable to engage in meaningful conversation."

As to these records, the court allowed "everything up to the word delusion, but delusion, colon, paranoid type will not be allowed in because it appears to be a diagnosis. But thought process is disorganized with thought blocks, hallucination, auditory type, internally preoccupied will stand as observations that [Dr. Weinstein] can rely on for her opinion."

Dr. Weinstein, in turn, testified the recorded behaviors— disorganized thought processes and thought blocking, and inability to engage in

7

meaningful conversation—were symptoms of schizophrenia, and symptoms on which she based her opinion that A.R. was gravely disabled.

A.R. cites to no evidence or authority supporting his claim that these reported behaviors were not, as Dr. Weinstein testified, symptoms of schizophrenia, but rather, were, themselves, diagnoses of some kind. Moreover, Dr. Weinstein's testimony makes it clear these were observable conditions. She testified, "Thought blocks I talked about previously is an impairment in the flow of thinking, so the thought will start and the individual will start to speak and then stop mid thought or withhold— withhold the thought. Internal preoccupation is often observed when auditory hallucinations occur. Of course they're distracting and the person having the auditory hallucination is appearing preoccupied with something that is not visible to the bystander."

A.R. also points to a July 21st entry in the records that he became assaultive and received emergency medication. He claims a "need for emergency medication is an opinion."

The record at issue was a handwritten "psychiatry progress note," (capitalization omitted) which stated, "patient became aggressive and assaultive towards staff when informed that he is due for monthly injection. . . . Doctor was notified and given emergency medication. . . ." The court overruled A.R.'s objection "[b]ased upon the total review of that entry," and Dr. Weinstein testified A.R. "was given—he required emergency medication as ordered by the treating psychiatrist."

The court did not abuse its discretion in allowing the evidence. The entry in the record described the observable fact that A.R. became assaultive and *was given* emergency medication by staff as ordered by the treating psychiatrist. And even if allowing the word "emergency" was an abuse of

8

discretion, it was harmless, since the point of the testimony was that A.R. became so combative, he was medicated.

A.R. also claims it is not clear that the following six entries were made by the individual observing the behavior: (1) a January 25, 2021 entry that A.R. spit at and tried to bite staff; (2) a January 26th entry that A.R. was fighting and physically restrained by staff; (3) a February 7th entry that A.R. was discharged from the hospital but brought back inside for his own safety because he was so confused; (4) a March 22nd "interdisciplinary progress note" (capitalization omitted) that he attacked another patient; (5) a May 6th entry that he threatened and lunged at staff and was physically restrained; and (6) the July 21st entry that A.R. was assaultive and given emergency medication.

In *S.A.,* the conservatee made the same argument on appeal—that "not every entry expressly states that the person who recorded it was the direct observer. She point[ed], for example, to an entry that begins 'Per staff . . .' and questions whether the writer witnessed the events." (*S.A.*, *supra*, 25 Cal.App.5th at p. 448.) The court rejected the argument, stating "the trial court considered these arguments, reviewed the records, and found the PHF records were 'clearly the reports of persons and staff, licensed psychiatric technicians, . . . who are reporting [S.A.'s] observed conduct' and the board and care facility records were 'obviously the observations . . . of the people in the psychiatric program.' " (*Ibid*.)

Likewise here, the bulk of the six entries at issue were obviously the observations of people at the psychiatric facilities. The first two identified entries are "Seclusion/Restraint Orders" signed by A.R.'s medical providers, an R.N. and an M.D. Each describes A.R.'s behavior leading to the restraint order, and the conditions to be met for release from restraint. There is

9

nothing to indicate the entries were not made by the individual making the observations.

The February 7th entry is part of a "Psychiatric Evaluation" (some capitalization omitted) completed by the attending physician. Again, there is no indication the recorded observations were not made by the physician; in fact, part of the entry states "seen this morning at 9 a.m."

The March 22nd entry is from the "Interdisciplinary Progress Notes." (Some capitalization omitted.) It is the only entry identified by A.R. that appears to have been recorded by a staff member other than the one witnessing it: the entry states A.R.'s physical attack on another patient was "witnessed by MHT on duty."

The May 6th entry is from the "ED Notes" and is signed by an RN, stating "Pt was agitated and observed threatening & cursing staff. Pt lunged at staff and was restrained physically."

The July 21st entry is also from the "Interdisciplinary Progress Notes," (some capitalization omitted) and consists of a series of handwritten notes, each of which is signed. One of them states, "[p]atient became aggressive and assaultive towards staff when informed that he is due for monthly injection. . . ."

Thus, with the exception of the March 22nd entry, none of the entries indicate they were made by anyone other than the individual identified as preparing the notation. The custodian of records of Fremont Hospital declared: "The records were prepared by personnel of Fremont Hospital, either by hand or electronic input, in the ordinary course of business at or near the time of the act, condition, or event described in the records." The declaration of the custodian of records of the Villa Fairmont as to the records' preparation used identical language. The custodian of records of the

10

Alameda Health System similarly declared: "The records were prepared by the personnel of the hospital, staff physicians, or persons acting under the control of either, in the ordinary course of hospital business at or near the time of the act, condition, or event."

As did the Court of Appeal in *S.A.*, we therefore "conclude [the conservatee's] medical records, as redacted, were admissible under the business records exception to prove the acts, conditions, and events recorded therein. (Evid. Code, § 1271.)"[3] (*S.A.*, *supra*, 25 Cal.App.5th at p. 447.) To the extent the March 22nd entry may not have been based on personal observation of the person making the entry, it was cumulative evidence of A.R.'s aggressive behavior and, in any case, any error in its admission was harmless. (See *Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1286 ["The standard for prejudice applicable to state law error in admitting hearsay evidence is whether it is reasonably probable the appellant would have obtained a more favorable result absent the error."].)

*The Disabilities Imposed*

A.R. does not dispute that substantial evidence supports the court's finding that he suffered from a grave disability or the appropriateness of his placement. He does dispute, however, that substantial evidence supports three of the disabilities the court imposed.[4]

" 'If a person is found gravely disabled and a conservatorship is established, the conservatee does not forfeit legal rights or suffer legal disabilities merely by virtue of the disability. (§ 5005; *Conservatorship of*

---

[3] Accordingly, we likewise conclude the admission of this evidence did not violate A.R.'s due process rights.

[4] A.R. does not challenge the firearm disability.

11

*Walker* (1989) 206 Cal.App.3d 1572, 1578. . . .)  The court must separately determine the duties and powers of the conservator, the disabilities imposed on the conservatee, and the level of placement appropriate for the conservatee.  (§§ 5357, 5358.)  The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal.' " (*George H*., *supra,* 169 Cal.App.4th at p. 165.)

"[A]n appellate court evaluating the sufficiency of the evidence in support of a finding must make an appropriate adjustment to its analysis when the clear and convincing standard of proof applied before the trial court.  In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)  Therefore, "[w]e must determine whether the record contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this clear and convincing standard of proof.  [Citation.]  We do not reweigh evidence." (*Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 56 (*S.A. II*).)  We also "presume in favor of the judgment the findings of fact necessary to support it." (*Ibid.*)

*Medical Care Decisions*

A.R. maintains the trial court "denied [him] the right to make decisions about his own general medical care" and no substantial evidence supports this disability.

12

To begin with, the court did not disable A.R. from making decisions about his "general medical care." Rather, it limited only his "right to refuse or consent to treatment related specifically to the Conservatee's being gravely disabled, including psychotropic medications." It did *not* check the box on the form "Order Appointing Conservator" that would have extended the disability to the "right to refuse or consent to routine medical treatment *unrelated*" to "remedying or preventing the recurrence of the Conservatee's being gravely disabled." The Public Guardian, likewise, states in its respondent's brief that it "did not request, and the court did not grant, [a disability as to the] right to refuse or consent to routine medical treatment."

With respect to his ability to make medical decisions concerning his grave disability, A.R. claims, specifically, that "there was no evidence that [he] could not evaluate the risks and benefits of his medication."

"A competent adult has the right to refuse medical treatment, including the right to refuse psychotropic drugs. (*In re Qawi* (2004) 32 Cal.4th 1, 14 . . . (*Qawi*).) A court's determination that a conservatee is gravely disabled does not, by itself, justify imposing an order allowing involuntary medication. [Citations.] Conservators may seek added authority over conservatees, including a limitation on the conservatee's right to refuse medical treatment. The statute refers to medication authority as imposing a 'disabilit[y]' on the conservatee. (§ 5357, subd. (d).)" (*S.A. II*, *supra*, 57 Cal.App.5th at p. 55.)

"A court may order involuntary medication if clear and convincing evidence shows the conservatee is incompetent to give or withhold informed consent. (*Riese* [*v. St. Mary's Hospital & Medical Center* (1987)] 209 Cal.App.3d [1303] . . . ,1322–1323.) In *Qawi*, the California Supreme Court approved *Riese* and *Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 535 . . . , which listed factors a court must consider to determine whether a

13

conservatee is incompetent.  (*Qawi, supra*, 32 Cal.4th at pp. 17–19.)  The factors include whether the conservatee lacks mental capacity rationally to understand the nature of the medical problem, the proposed treatment, and its attendant risks.  (*Id.* at p. 18.)" (*S.A. II, supra*, 57 Cal.App.5th at pp. 55–56.)

"Judicial determination of the specific competency to consent to drug treatment should focus primarily upon three factors: (a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention (e.g., 'an acutely psychotic patient should understand that psychotropic medication carries the risk of dystonic reactions [i.e., abnormal control and coordination of movement] . . . that the benefit is the probable resolution of the psychotic episode; and that alternatives include psychotherapy and milieu therapy, and possibly ECT, but that at least the two former alternatives carry a lower short-term success rate than does medication.' (Gutheil & Appelbaum, Clinical Handbook of Psychiatry and the Law, *supra*, at p. 219)); and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought (§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes.  With respect to this last consideration, it has with reason been urged that 'the appropriate test is a negative one: in the absence of a clear link between an individual's delusional or hallucinatory perceptions and his ultimate decision,' it should be assumed 'that he is utilizing rational modes of thought.' " (*Riese v. St. Mary's Hospital & Medical Center, supra*, 209 Cal.App.3d at pp. 1322–1323.)

14

The "Order Appointing Conservator" (some capitalization omitted) expressly recites that, "In considering whether to impose disabilities on the Conservatee's right to refuse or consent to treatment . . ., the Court has considered the following factors: a) whether the Conservatee is aware of the nature of his or her grave disability; b) whether the Conservatee is able to understand the benefits and the risks of, as well as alternatives to, the proposed intervention; and c) whether the Conservatee is able to understand and to knowingly and intelligently evaluate the information required to be given to patients whose informed consent is sought and to otherwise participate in the treatment decision by means of rational thought process."

In *S.A. II,* the court considered circumstances similar to those at hand. The conservatee in that case was also diagnosed with schizophrenia. (*S.A. II, supra*, 57 Cal.App.5th at p. 51.) A psychologist interviewed S.A., reviewed her charts and records, and testified she had symptoms of schizophrenia. (*Ibid*.) The psychologist explained, "S.A. 'has a complicated set of ideas about what reality is to her.' " (*Ibid*.) She "asserted that S.A. was not her name and that her true name is completely different." (*Ibid*.) She "denied she had a mental illness and believed instead she had anemia." (*Ibid*.) She told the psychologist that her mother (and conservator) had schizophrenia, but she did not. (*Ibid*.) Because she did not believe she had a mental illness, she did not want to stay at a board and care facility. (*Id*. at p. 52.) S.A. also believed her mother had kidnapped her, and her true parents were movie stars Michael Keaton and Michelle Pfieffer. (*Id*. at pp. 52–53.) Although S.A.'s mother was from India, S.A. "denied her Indian heritage." (*Id*. at p. 52.) She told the psychologist she was not willing to take medication because she believed it caused her to have a darker complexion than her "true" parents. (*Ibid*.) The psychologist testified S.A.'s beliefs were delusions and she did not

15

have "enough mental capacity to make an informed refusal of medication." (*Ibid.*)

The court in *S.A. II* concluded "[s]ubstantial evidence supported a finding that S.A. lacked the mental capacity rationally to understand the nature of her mental illness, her medication, and the risks of stopping her medication." (*S.A. II, supra*, 57 Cal.App.5th at p. 56.) The court went on to explain, "S.A. denied having schizophrenia and rejected any need for medication. She thought her medication caused her skin to darken. This belief is related to her delusion Michael Keaton and Michelle Pfeiffer were her parents. [A psychologist] testified S.A. lacked mental capacity to make an informed refusal of her medications. This evidence supported the court's order." (*Ibid.*)

The record before us is much the same. Although A.R. maintains "there was no evidence that [he] could not evaluate the risks and benefits of his medication," there is, in fact, abundant evidence supporting such finding.

There was evidence he did not know what city he was in, who the president was, or why he was in the hospital. He told Dr. Weinstein "he suspected somebody called and lied," resulting in his hospitalization. Like the conservatee in *S.A. II*, A.R. had a delusion he had a different name, as well as a delusion he owned a hotel where he could stay. Also like the conservatee in *S.A. II,* A.R. did not believe he had schizophrenia or any mental illness, he did not think he needed psychotropic medication, and he often violently refused it. Indeed, he was receiving psychotropic medication through intramuscular injection due to his refusal to take oral medication. He also was functioning under a delusion about his prescribed medication, believing it would cause him to be more prone to take illegal drugs. A.R. additionally told the psychologist he had no plan to connect with psychiatric

16

care providers in the community and would not take his medication unless forced.

Dr. Weinstein testified A.R.'s "schizophrenia impairs his perception . . . resulting in auditory hallucinations, difficulty deciphering what's real and not real, resulting in paranoid concerns which correlate with . . . verbal aggression or physical aggression." She further testified A.R. lacked insight into his mental health disorder and symptoms, refused to take medication, and was unable to participate in meaningful treatment.

In sum, there is substantial evidence to permit a finding by clear and convincing evidence, as the court made here,[5] that A.R. suffers from a grave disability that so impairs his reasoning—through cognitive confusion and delusions about his own condition and medical needs, and the consequences of taking his prescribed medication—that he could be disabled from making his own treatment decisions with respect to his disability.

*Driving*

A.R. also claims no substantial evidence supports the driving disability.

In *George H.*, the court considered a similar challenge to a driving disability. (*George H., supra*, 169 Cal.App.4th at p. 166.) In that case, there was no evidence specifically about the conservatee's ability to drive, and the

---

[5] Finding number 5 of the "Order Appointing Conservator" (some capitalization omitted) states, "There is clear and convincing evidence that the Conservatee lacks the capacity to refuse or consent to treatment related specifically to the Conservatee's being gravely disabled, including psychotropic medications, because the Conservatee is incapable of making rational decisions and lacks the mental capacity to rationally understand the nature of his or her psychiatric/medical condition, the proposed treatment, and the attendant risks." Finding 6 states, "It is in the Conservatee's best interest" to empower the conservator to "require the Conservatee to receive treatment related specifically to remedying or preventing the recurrence of the Conservatee being gravely disabled."

conservatee maintained his " 'mere status of conservatee does not, ipso facto, establish incompetence.' " (*Id*. at p. 165.)

The court concluded there were "no grounds for reversal. The trial court here properly specified each of the powers and disabilities it imposed. Appellant impliedly argues that a specific, on-the-record statement of the reasons for each order is required. We see no such legal requirement. Instead, we follow the usual rules on appeal [citation] and 'presume in favor of the judgment every finding of fact necessary to support it warranted by the evidence.' [Citation.] [¶] The evidence warranted the trial court findings. The public guardian presented ample evidence that appellant suffered from a mental illness, making medication necessary, and the public guardian's report, [his physician's] testimony, and [his] mother's testimony was that appellant often refused to take his medication. This evidence, and the evidence that appellant suffered delusional beliefs and auditory hallucination, supported the order suspending appellant's driving privilege and right to contract." (*George H.*, *supra*, 169 Cal.App.4th at pp. 165–166.)

So too here. Although there was no evidence that related, specifically, to A.R.'s physical ability to drive, there was abundant evidence of his schizophrenia and its symptoms, including delusions, auditory hallucinations and impaired perceptions, and his need for medication which he refused to take voluntarily. As in *George H.,* this evidence amply supports the trial court's express finding that A.R. "cannot safely operate a motor vehicle.[6]

---

6 Finding number 9 of the "Order Appointing Conservator" (some capitalization omitted) states, "There is clear and convincing evidence that [¶] . . . the Conservatee cannot safely operate a motor vehicle."

18

*Right to Contract*

Lastly, A.R. asserts no substantial evidence supports the contracting disability.

He cites to Civil Code section 1556, which provides "All persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights." He asserts there are "three classifications of incapacity based on an 'unsound mind,' " and claims he does not "fall into any of the three classifications." He further cites to Civil Code section 38, which provides that "A person entirely without understanding has no power to make a contract of any kind. . . ." Civil Code section 39 provides in pertinent part, "(a) A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before the incapacity of the person has been judicially determined, is subject to rescission. . . . (b) A rebuttable presumption affecting the burden of proof that a person is of unsound mind shall exist for purposes of this section if the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence. Substantial inability may not be proved solely by isolated incidents of negligence or improvidence." (Civ. Code, § 39, subd. (a), (b).) He also points out Civil Code section 1575 provides "Undue influence consists: 1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; 2. In taking an unfair advantage of another's weakness of mind; or, 3. In taking a grossly oppressive and unfair advantage of another's necessities or distress."

To begin with, A.R. cites no authority suggesting, let alone holding, that these statutes govern a probate court's imposition of conservatorship disabilities under section 5357, subdivision (b), or that he must fall into one

19

of these three categories in order for a court to restrict his ability to contract. Furthermore, A.R. has been adjudicated, on the basis of clear and convincing evidence, as "lacking the capacity" to make medical decisions, decisions that are of equal weight and import as decisions about entering into contracts.

In any case, abundant evidence supports the court's express finding that there is "clear and convincing evidence" that "the Conservatee is not competent to enter into contracts." We have recited this evidence in detail in the preceding pages, and need not, and do not, recount it again here. Among others things, Dr. Weinstein testified A.R.'s "schizophrenia impairs his perception . . . resulting in auditory hallucinations, difficulty deciphering what's real and not real." She further testified he suffers from a number of delusions, including that he bears a different name. This evidence amply supports the contracting disability.

## DISPOSITION

The conservatorship order is affirmed.

_____
Banke, J.


We concur:


_____
Humes, P.J.


_____
Wiss, J.*


*Judge of the San Francisco Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.


A163629, Conservatorship of AR