Filed 1/12/26; Certified for Publication 2/4/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of A.B. | |
| PUBLIC GUARDIAN OF SAN FRANCISCO COUNTY,<br><br>　　　Petitioner and Respondent,<br><br>v.<br><br>A.B.,<br><br>　　　Objector and Appellant. | A173111<br><br>(San Francisco County Super. Ct. No. PMH22024757) |

A.B. appeals from the renewal of conservatorship and involuntary medication orders pursuant to the Lanterman-Petris-Short Act (LPS) (Welf. & Inst. Code,[1] § 5000 et seq.).  He contends the evidence was insufficient to demonstrate he is currently gravely disabled and incompetent to give or refuse informed consent to medication.  We affirm.

---

[1] Further statutory references will be to the Welfare and Institutions Code.

1

# BACKGROUND

## I.

### *General Background*

A.B. was 42 years old at the time of the current proceedings. As related in a 2022 conservatorship investigation report, he had a diagnosis of undifferentiated schizophrenia with "disorganized thought process, bizarre behaviors and internally pre-occupied features," and had been receiving mental health services in San Francisco since 2008. These included crisis interventions, psychiatric hospitalizations, residential treatment facilities, acute diversion units and stabilization programs. He had a history of assaultive and threatening behaviors, resulting in "numerous" restraining orders. He had minimal insight into his psychiatric symptoms (described as paranoia, persecutory delusions and auditory delusions), denied having the symptoms or needing the medication and had a history of medication and treatment noncompliance in the community. He was under conservatorship from September 2020 to September 2021 and consistently complied with medication during that time, but when the conservatorship was terminated, he disengaged from services and decompensated.

In October 2022, A.B.'s aggressive and threatening behavior resulted in a section 5150 hold for psychiatric assessment and admission to the psychiatric unit at St. Francis Memorial Hospital. In November, the public conservator filed a petition for appointment as A.B.'s conservator and requested an involuntary medication order. A.B. was reported to have been showing volatile and unpredictable behavior since being off medication (a monthly injection); he lived with his mother but she had filed for a restraining order against him; A.B. had not left the house for three months; and two of his mother's tenants had moved out due to A.B.'s "bizarre"

2

behavior.  The conservator's recommendation stated that A.B. lacked insight into the change in his behavior since stopping his medication and had a history of previous conservatorships, hospitalizations and noncompliance with medication management absent court order, and that he was unable to provide for his own food, clothing and shelter due to severe anxiety and paranoia.  The physician's affidavit in support of the request for an involuntary medication order stated that A.B. was compliant with medication in the inpatient setting but had a history of noncompliance as an outpatient; his mother had a restraining order against him until a medication order was implemented, and returning home was "clearly" the best option for A.B. because he "would not survive in the shelter system."  The public conservator was appointed temporary conservator and the involuntary medication order was imposed.

A jury trial began in April 2023 and concluded with a mistrial on May 2 because the jury was unable to reach a verdict.  On May 16, the parties resolved the case with an agreement pursuant to which A.B. submitted to the sufficiency of the allegations of the petition and consented to the conservatorship, retroactive to December 2022 and terminating on December 14, 2023, but without an involuntary medication order.  The public conservator was appointed on May 18, 2023.

In November 2023, the public conservator filed a petition for reappointment and requested an involuntary medication order.  The conservator stated that A.B. and his mother agreed the family home was the appropriate level of care but A.B.'s insight and judgment remained poor and without an involuntary medication order he was noncompliant, "leading to paranoia, persecutory delusions, bizarre behaviors, aggression, and physical assaults, requiring the involvement of [the San Francisco Police Department]

3

for crisis interventions." A.B. was "dismissive of potential legal consequences of his actions including restraining orders which will prevent him from living at home" and "unable to access food as needed, without the support of his mother." The petition included a supporting statement and affidavit concerning antipsychotic medication from psychiatrist Dr. Virginia Mommsen. The conservatorship petition and request for an involuntary medication order were granted after a hearing on November 16, 2023.

In November 2024, the public conservator sought the renewal of the conservatorship and involuntary medication order at issue in this appeal. The conservator stated that A.B.'s insight remained poor; he continued to deny the need for medication; and without an involuntary order he would refuse to comply, leading to decompensation. Living at home was the appropriate level of care "on the condition that he remain compliant with medication with the current support from Citywide Intensive Case Management services." While under conservatorship, A.B. had had no incidences of violence or aggression toward neighbors or involvement with emergency services.

Mommsen's statement in support of the petition (which was identical to her statement in support of the 2022 petition) stated that she had diagnosed A.B. with schizoaffective disorder, bipolar type, with symptoms including paranoia, delusions, disorganized thought and behavior, "affective flattening," asociality and apathy. A.B.'s prognosis without medication was poor; his treatment was complicated by his lack of insight into his mental illness and beliefs that he did not have a mental illness or need medication and was being persecuted and made to take medication erroneously and for arbitrary punitive reasons. A.B. was unable to provide shelter for himself due to his psychiatric disorder in that he became aggressive and sometimes

4

threatening when off medication, as a result of which his mother would not allow him to live at home without taking medication; he lacked insight and ability to reliably take medication without a legal mandate; and due to his lack of insight and unwillingness to live anywhere other than his mother's home, he had been unable to remain housed elsewhere for "other than very brief amounts of time."

Mommsen's affidavit concerning antipsychotic medication (also almost entirely identical to the one for the 2022 petition) related that in attempted discussions about medication, A.B. repeatedly said, " 'no comment,' or 'I'm fine' " and, on June 24, 2024, said, ' 'I'm fine, I will take oral medication.' " Mommsen believed A.B. agreed to take oral medications "against his beliefs" because he knew his compliance could not be monitored, but intended not to take them "as he has done multiple times in the past and is consistent with his belief that he does not need them." Mommsen stated that A.B. was not able to understand the risks or benefits of medication because "he will not "entertain the idea that he might need medication for mental or behavioral stability" and was not able to rationally understand and evaluate information regarding informed consent because he "suffers a fixed and false belief that the medication has no relevance to his life."

On March 6, 2025, A.B. waived his right to a jury trial, and a court trial was conducted that day and April 3, 2025. On April 3, the court granted the petition for renewal and the involuntary medication order, finding A.B. was gravely disabled and would not be able to provide for his own shelter because his mother would not allow him to live with her without a conservatorship and mandatory medication order in place.

A.B. filed a notice of appeal on April 17, 2025.

5

## II.

### *The Trial*

**A. A.B.'s Mother's Testimony**

Marcia Clay testified that A.B. had lived with her since he was born, aside from living in dormitories in college, in Washington for about six months and with his father for "a number of months." She currently received $500 from his monthly social security payments as rent. Clay was "alerted" to A.B.'s mental health issues by the dean of students when A.B. was in college. A.B. had never personally told her he had a mental illness, but they had discussed the subject in the context of her accompanying him to apply for social security disability. She understood from "different people's input" that his diagnosis was "schizophrenia affective disorder with components with opposition defiant disorder." A.B. had "on occasions" told her "very adamantly" that anti-psychotic medication was "a poison and bad for his system."

A.B. had been on a conservatorship prior to 2023 but Clay's sense of dates was "fuzzy." In 2023, he was conserved and subject to an involuntary medication order, but the medication order was lifted after a trial in April 2023. Clay expected A.B. to stop taking his medication when the order was lifted because "that was the precedent," and she expected to see changes in his behavior in five months because historically he would decompensate five months after going off medication. By September or October, she started observing the symptoms she had previously seen.

On the night of October 27, 2023, a loud and "disturbing" alarm went off in the alley behind Clay's unit. A.B. started to take items out of the back room abutting the alley and put them in his room, then barricaded the back room and removed the doorknob, saying "they can get in from the alley." He

moved items from the kitchen and then the porch into his room. Photographs of A.B.'s bedroom showed items including a large garbage bin normally kept in the kitchen pantry; an upside-down chair from the porch; pot lids; a salad spinner; drawers from the back room; a dresser, tilted sideways, that was normally outside the bedroom; and a pile of china. Clay testified that A.B. moved "most of the items in the kitchen" into his room—"kitchen cupboards, top to bottom emptied, kitchen pantry, including the shelves, oven and stove, all of stove-top burners." This process lasted from 3 a.m. to 6 a.m., A.B. "going non-stop"; Clay was unable to stop him and "just hid in [her] room." Asked if she feared for her safety, she testified that she "felt fearful that he [was] not acting calm and collected" but "he seemed more fearful than [she] was because he was afraid [they] were going to be attacked and believed that he was protecting [them]." She testified on cross examination that she was not concerned for her personal safety during this incident.

Clay contacted the conservator's office and the police, and A.B. was taken to St. Francis Hospital. On November 16, an involuntary medication order was put in place and Clay allowed A.B. to come home. For the next 15 months, A.B. took his medications pursuant to the court order. Clay drove him to get the medication and reminded him when he missed the date.

Asked if A.B.'s behavior on October 27 was typical of what he was like when off his medications, Clay said it was "not typical, but one of many forms of behaviors" she had seen. His most common behavior was shouting randomly, often out the windows of their unit. Asked for examples, Clay consulted a diary she kept and testified that on January 14, 2019, A.B. shouted at her that she was "the devil incarnate" and "needed to die," then pushed her against the kitchen counter. She subsequently called 911.

7

Clay testified that A.B. had been involuntarily detained for treatment (§ 5150) 14 to 16 times between 2008 and 2022. She would not allow him to live at home if the conservatorship was extended without a mandatory medication order. She explained, "[t]his has gone on for 16 years, and in the same way, he decompensates off of [the order]. He won't take his medication. I would anticipate that again. And I feel fearful, frankly, to be around him since in the past, I have experienced aggression from him." A.B. had pushed her and knocked her over when he was not taking his medication; once, her head almost hit a piece of furniture as she fell flat on her back. Clay was also concerned about A.B.'s safety without a medication order because she had seen the police handle him "very roughly when they take him in for 5150's or arrest."

Clay did not believe A.B. would take his medication without the conservatorship because he had "never stuck to them on his own" in the past. When asked where A.B. could live if not with her, Clay testified that he expressed a preference to live at home and in 2009 or 2010 had "even been homeless rather than stay in a hotel because the hotel made him unhappy." Several times in the past he had attempted to live in group homes but then asked to come home, and "in a loop" she would tell him he could come home when he was on medication.

**B. Mommsen's Testimony**

Mommsen testified that A.B. had been a patient at her clinic, Citywide Case Management (Citywide) since 2011, and directly under her care since 2019. His diagnosis was schizoaffective disorder. Without medication, his predominant symptoms were paranoia and chronic delusions; other symptoms included flat affects and asociality. He did not demonstrate insight into his condition, did not believe he had a mental impairment and

8

did not believe he needed medication. Over the years, he had communicated this "[v]ery directly, saying "I don't need medication, I don't want medication." Since the 2023 conservatorship trial, however, Mommsen and A.B. had met "very infrequently" and his answer to most of her questions was "no comment." After the trial, A.B. had "mostly refused to fully engage with the clinic," and he refused to meet with Mommsen in person. She found this "understandable" because "it was very stressful." She and A.B. met by Zoom and by phone. She had seen him "a number of times" but mostly got her reports from clinic staff. She commented, "he's not interested in meeting with me, which is fine. I can honor that based on our team approach."

A.B. was currently treated with Invega Sustenna, a long-acting injectable antipsychotic. He had been prescribed this particular medication for a couple of years, and "[s]ome variation on the theme" for over 20 years. His current medication was prescribed once a month but A.B. took it every five to six weeks, as he needed to be reminded to come in for injections. Mommsen thought the court's medication mandate was the reason A.B. was currently taking his injected medication despite believing he did not need it, as the "consistent cycle over the years" she had worked with him was that he would not take the medication when the mandate was not in place.

Mommsen testified that A.B. had asked for oral medication many times in the past and, while there was no way to monitor his compliance, she did not think he took it on his own. When the involuntary medication order was lifted pursuant to the agreement following the 2023 trial, A.B. asked for oral medication. He picked it up from the pharmacy but, based on her clinical experience with him, Mommsen believed he did not take it, and after about six months he decompensated and was hospitalized. In 2021, A.B. had been stable on the injected medication for about 16 months and Mommsen

"dropped" the conservatorship and involuntary medication order to give him a chance to "do as he was saying, to continue taking medication and not be under conservatorship." As soon as the conservatorship was terminated, A.B. said he wanted oral medication and "clinically he gradually decompensated and the same cycle repeated." Mommsen testified that A.B. had been hospitalized as a result of decompensating about 25 times since around 2009.

A.B. had never expressed understanding that medication could lessen his symptoms and stabilize him in the community. Asked why he did not like taking the medication, Mommsen said, "like anyone who doesn't believe they have a problem wouldn't want to take medication for something they don't believe they're experiencing." A secondary reason was that A.B. in general does not like getting shots. She had offered him the option of a six-month formulation of his medication so he would only need two shots a year, but he was "absolutely uninterested."

Regarding A.B.'s ability to live independently in the community without a conservatorship, Mommsen testified that they had tried "a number of times to get him into different living situations" but he did not follow through. Told that A.B. had a plan to rent a room at the William Penn Hotel (William Penn), Mommsen testified that renting a room was within his capabilities "in the most technical sense" but reiterated that "[i]n the past when that has been pursued, he ultimately is not interested in living in an SRO in a place with a lot of other people that he doesn't know without his pets, et cetera" and he "has not followed through with any kind of plan to advance something like that." She also had concern about him "sustaining that" if he was not taking medication. She explained that, based on her "educated guess and clinical experience, . . . every time he goes off the medications, he seems to have trouble, and so I would imagine that he would

have trouble out in the community living independently if he were not taking medication."

Mommsen also had concerns about A.B.'s personal safety because "he tends to get into conflicts with others." She offered the October 2023 incident as an example, noting that, according to the police report, A.B. was in a "standoff with the police," refusing to let them into his room "for maybe several hours," and when contacted, had "knives and swords tied around his body." Mommsen stated that while A.B. did not use the weapons and she did not think he ever intended to be violent, "presenting to the police in that way can definitely put you at risk, and that would be something I would be concerned about."

Mommsen opined that A.B. was gravely disabled in that living with his mother was "the only shelter that he wants and that we have been able to get him," he was unable to stay there without medication, and he was unable to be medicated without a monthly injection. She believed A.B. lacked the capacity to give or withhold informed consent to psychotropic medication because he did not have insight into his mental illness and need for medication and he could not be housed without medication.

### C. A.B.'s Testimony

A.B. testified that his monthly income consisted of around $1,200 from Social Security, $500 of which was sent directly to his mother for rent, plus $300 in "EBT" food stamps. He had about $2,000 in savings. His mother sometimes prepared food for him and sometimes he purchased food from Amazon or Trader Joe's and prepared it himself. He paid for "most" of his food and for his clothing, which he purchased online. If he was off conservatorship, his first choice for housing would be to continue living with his mother and his second choice would be to try to rent a room from William

11

Penn. He had submitted an application to the hotel about two weeks before and was on the wait list but had not been told the length of the list. He had lived in an SRO in the past ("[m]ore than 10 years ago") and was able to manage that situation, and he thought he would be able to manage living by himself if he could no longer live at home.

A.B. testified that he understood his diagnosis of schizoaffective disorder as "paranoias" and agreed with it. He also understood that medication could reduce paranoia, agreed that in the past he had decompensated when off medication, and understood he needed to take it to avoid decompensating. He preferred oral medication to injections because the location to pick it up was closer and because he could avoid "punctures," and he had not accepted the option of receiving two injections per year instead of monthly because he had not "gotten around to" studying the medication as he had been "busy with other things."

A.B. denied ever referring to his medication as "poison" and did not believe it was poisonous. When he did not take his medication, it was to see whether he needed it, and prior to the October 2023 incident thought he did not. Asked if he did not believe he had a mental illness at that time, he replied that he "didn't have paranoias of that level in 2023." He now recognized that his fear of an attack from neighbors in the October 2023 incident was paranoia; his breakdown was "enough to show [him] that the diagnosis was correct"; and he would take medication now because "[t]he last 5150 gave me solid evidence of paranoia." He had not had symptoms of schizoaffective disorder since October 2023 and attributed this to taking his medication. He did not have symptoms of schizoaffective disorder other than paranoia.

A.B. did not disagree with Mommsen's testimony that he had been hospitalized 25 times in the last 16 years. Asked why he had been hospitalized so many times, A.B. testified, "Frequently there have been arguments with my mother where she would escalate confrontations with me, and not feeling satisfied with my response to her escalations, she would call 5150s, often inventing reasons to tell them that were not factual. I have an audio recording from my father where he says she admitted lying to 5150 me, and urged him to say specific lies to obtain 5150s." When counsel asked how many of his psychiatric hospitalizations had been "solely because [his] mother made up the story," A.B. said he was "not sure the exact count, but it's high." He testified that his last hospitalization was the only one that was due to his mental illness.

A.B. knew that pets are not allowed at William Penn and testified that he could live somewhere without them. He had not been told how soon he could move into the hotel and had not yet asked. He testified that his mother had told him that if he prevailed in this hearing and was not under conservatorship, he could continue to rent from her. If he could not do this, he would rent an SRO from William Penn or "many others posted on-line." He testified that since he had already paid rent for the current month, he had a month to find another residence. He had looked at other listings on Craig's List but William Penn was his favorite because it has a private bath, so this was the only one he applied to. The minimum income requirement for him to live there was $1,250.

**D. Argument and Decision**

In argument, counsel for the public conservator emphasized A.B.'s lack of insight into his mental illness and history of stopping his medication when there was not a court order in effect. Counsel asked the court to credit the

13

testimony of Clay and Mommsen and not A.B.'s testimony that he suddenly realized he had a mental illness that would be helped by medication after the October 2023 incident, after having rejected these conclusions for most of his life.

A.B.'s attorney urged that he had been in the community without a medication order for over a year after September 2021 without problems sufficient to trigger a new petition, and again from May to October 2023, and that the hospitalization in October 2023 was the only one in "at least the last four years."[2] Counsel argued that the October 2023 hospitalization was the "wake-up call" that convinced A.B. he had a mental illness and needed medication, and since then he had not gone off his medication and had not decompensated. Counsel maintained that Mommsen's description of A.B. agreeing to a lower dose of injectable medication and contacting her when the pharmacy dispensed the higher dose showed his ability to rationally engage with her about medication, and that A.B.'s testimony showed he had the ability to obtain food and clothing for himself.

The trial court focused on A.B.'s lack of insight into his mental health condition and history of decompensating due to not taking medication. The court credited Clay's and Mommsen's testimony over A.B.'s, specifically referring to Clay's testimony that A.B. never said he had a mental illness, did not accept the need to take antipsychotic medication and said the medication was poison, and Mommsen's testimony that A.B. did not believe he had a mental impairment or needed medication, that he refused to engage with her in discussing his condition and medication, and that she did not believe he

---

[2] Counsel's facts appear to be inaccurate, as the record reflects that A.B. was hospitalized in October 2022.

14

would take the medication without an involuntary medication order.  The court found A.B. is gravely disabled and would not be able to provide for his own shelter because Clay would not allow him to live with her without an involuntary medication order, a conservatorship and him taking his medication.

## DISCUSSION

### I.

### *The Conservatorship Order Is Supported by Substantial Evidence.*

#### A. Governing Principles

The LPS "authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled (§ 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement (§ 5350.1). As defined by [LPS], a person is 'gravely disabled' if, as a result of a mental disorder, the person 'is unable to provide for his or her basic personal needs for food, clothing, or shelter.'  (§ 5008, subd. (h)(1)(A).)" (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142.)  A conservatorship automatically terminates one year after appointment of the conservator; another petition is required if the conservator determines further conservatorship is required.  (§ 5361, subds. (a), (b).)

The "pivotal issue" in each proceeding is whether the proposed conservatee is "presently" gravely disabled.  (*Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030, 1034 (*Benvenuto*).)  "The conservator must show the conservatee is presently gravely disabled and not that he may relapse and become gravely disabled in the future.  (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577.)  Where the evidence establishes a person is not presently gravely disabled but may become so because of a future failure to take medication, an LPS conservatorship cannot be established.  ([*Benvenuto,*

15

*supra,*] 180 Cal.App.3d [at p.] 1034.)" (*Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446 (*Guerrero*).) But a person may be found gravely disabled if the evidence shows the person cannot provide for basic personal needs for food, clothing or shelter without medication and will not take the necessary medication unless required to do so. (*Conservatorship of Walker, supra,* at p. 1577 (*Walker*).)

"We review the whole record in favor of the judgment below to determine whether there was substantial evidence [A.B.] was gravely disabled beyond a reasonable doubt. [Citation.] Substantial evidence includes circumstantial evidence and reasonable inferences flowing from it.)" (*Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 54 (*S.A.*).) "Testimony of one witness can suffice to support a finding of grave disability." (*Ibid.*) "[A]fter a bench trial, we review the court's determinations about witness credibility with extreme deference. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)" (*Id.* at p. 55.)

**B. Analysis**

A.B. contends the evidence was insufficient to prove he is gravely disabled because, although it established he had a mental health disorder, it did not establish that the disorder resulted in him being unable to provide for his own basic needs, specifically shelter. In his view, the public guardian improperly focused on his ability to maintain his *preferred* housing with his mother, who would require him to have a mandatory medication order, but did not prove he would be unable to secure and sustain alternative housing. He argues a conservatorship cannot be imposed "merely to ensure that someone takes their government recommended medication so they can stay in their preferred shelter."

16

More generally, A.B. contends the testimony offered to demonstrate his disability was based on past circumstances, there was no evidence he currently had symptoms of schizoaffective disorder or lacked capacity to secure housing while medicated, and concern that he might stop taking his medication and become symptomatic and unable to sustain independent housing was not a sufficient basis for finding him gravely disabled. The underlying theme of his arguments is that the trial court erred in relying on Clay's and Mommsen's testimony concerning his lack of insight in the past and failing to credit his testimony that the October 2023 incident convinced him of his mental illness and need for medication.

As A.B. recognizes, individuals who lack insight into their mental illness and need for medication and are unable to provide for their basic needs without medication, may be found gravely disabled. (E.g., *Guerrero, supra,* 69 Cal.App.4th at pp. 446-447; *Walker, supra,* 206 Cal.App.3d at p. 1577.) He argues, however, that the evidence did not establish he *currently* lacked insight into his illness and the possibility of future decompensation is insufficient. He relies on *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15 (*Murphy*) and *Benvenuto, supra,* 180 Cal.App.3d 1030, which held that a perceived likelihood of decompensation is insufficient to find that a person currently able to provide for basic needs is gravely disabled, arguing that his case is more like these than like *Guerrero* and *Walker*.

In *Murphy,* the public guardian petitioned for reappointment as conservator of a conservatee who had been found gravely disabled due to alcoholism, was living in a care facility and had become intoxicated on at least three occasions in the last four years. (*Murphy, supra,* 134 Cal.App.3d at p. 17.) The expert witnesses agreed that the conservatee was currently

17

able to manage his own affairs but opined that if not under conservatorship he would start drinking and become gravely disabled again. (*Id.* at p. 17.) *Murphy* held the conservatee was not presently gravely disabled and could not be found gravely disabled based on "a 'likelihood' that if he were released he would at some future time return to the use of alcohol." (*Id.* at pp. 18-19.)

In *Benvenuto,* the conservatee's schizophrenia was in partial remission due to the medication he was taking and he currently had the ability to provide for his food, shelter and clothing needs. (*Benvenuto, supra,* 180 Cal.App.3d at p. 1033.) The expert who examined him testified that it was possible he would remain stable or improve if he was taken off conservatorship but continued his treatment program, but if he went to live with his mother, as he intended, he was likely to regress and become gravely disabled in a fairly short period of time. (*Ibid.*) Following *Murphy, Benvenuto* reversed the conservatorship order because Benvenuto was not " 'presently' gravely disabled." (*Ibid.*)

Neither of these cases discussed the conservatee's history, understanding of his mental health conditions or other basis for the experts' expectations that the conservatee would return to alcohol (*Murphy*) or stop taking medication (*Benvenuto*) and therefore become gravely disabled at some point in the future. By contrast, cases such as *Walker* and *Guerrero* hold that individuals may be *presently* gravely disabled if the evidence demonstrates they do not have insight into their mental condition, would not be capable of providing for their basic needs without medication and would not take the medication if not required to do so. The distinction is that the lack of insight—understanding of the illness and role of medication or other treatment in reducing its symptoms—indicates the individual will not

18

voluntarily continue to do what is necessary to maintain the ability to provide for food, shelter and clothing.

In *Walker,* the conservatee relied on *Murphy* and *Benvenuto* to argue that a conservator cannot be reappointed based on "the possibility that the conservatee would not take his or her medication if released." (*Walker, supra,* 206 Cal.App.3d at p. 1577.) *Walker* distinguished *Murphy* and *Benvenuto,* which the court described as holding that where a conservatee is not presently gravely disabled, a conservator cannot be extended based on a "perceived likelihood of future relapse." (*Walker,* at pp. 1576-1577.) In *Walker,* by contrast, there was medical testimony that the conservatee "remained gravely disabled because he had *no insight* into his mental illness" and "did not believe he was ill" or needed medication, and it was undisputed that he could not provide for himself without the medication. (*Id.* at p. 1577.)

*Guerrero* upheld a jury instruction to consider evidence of the conservatee's past failure to take prescribed mental health medication and lack of insight into his mental condition, and to find him gravely disabled if it found that he would not take medication unless required and that a mental disorder made him unable to provide for his basic needs without medication. (*Guerrero, supra,* 69 Cal.App.4th at p. 446.) The court explained that this instruction provided an "appropriate framework" for the jury to consider the evidence that "but for the medication, which Guerrero would not take without supervision, Guerrero was presently gravely disabled." (*Id.* at p. 447.)

A.B. argues that in *Walker, Guerrero* and other cases upholding conservatorships, there was evidence that the conservatees were symptomatic at the time of trial and denied having a mental illness at or shortly before trial (*Walker, supra,* 206 Cal.App.3d at pp. 1575-1577; *Guerrero, supra,* 69 Cal.App.4th at pp. 444-445; *S.A., supra,* 57 Cal.App.5th

19

at pp. 51-52),[3] whereas here A.B. had not suffered from paranoia or delusions since October 2023 and acknowledged having a mental illness and needing medication. A.B. argues that his testimony was not refuted and neither Clay

---

[3] The conservatee in *Guerrero* testified that he had been misdiagnosed since first going to a mental hospital more than 20 years before and denied being delusional, but also testified that "there were 45 superheroes in the United States, including a 'real Superman,' but they had all been killed." (*Guerrero*, *supra,* 69 Cal.App.4th at p. 445.) He testified that he would continue to take his medication without a conservatorship, but the psychologist from his residential facility testified that Guerrero refused to take one of his medications and was given another in liquid form due to concern he would only pretend to take pills, and that Guerrero had said he would not take medication because he did not believe he was mentally ill. (*Id.* at p. 444.)

In *Walker,* in an evaluation five days before trial, the conservatee expressed delusional beliefs including that the FBI had been after him for many years and was paying the staff at his residential facility to give him Drano and kerosene to burn his stomach out, yet maintained he was not ill and did not need medication. (*Walker, supra,* 206 Cal.App.3d at pp. 1575-1576.) His psychiatrist testified that he was actively hallucinating and needed 24-hour supervision; that with medication he had the cognitive awareness to be able to provide for his food, clothing and shelter; without conservatorship he would not take medication because he did not believe he was ill; and without medication he would become unable to care for his own needs. (*Ibid.*) When asked at trial whether he would take his medication if not under conservatorship, Walker responded only that he had taken it before. (*Id.* at p. 1577.)

In *S.A.,* the conservatee told the psychologist who interviewed her on the morning of trial, and testified at trial, that she did not believe she had a mental illness and planned to stop taking medication if not on conservatorship. (*S.A., supra,* 57 Cal.App.5th at pp. 51-52.) She expressed beliefs including that her mother had kidnapped her from her true parents, Michelle Pfeiffer and Michael Keaton. (*Id.* at p. 52.) The psychologist testified that S.A. was symptomatic even on medication and would be " 'much worse' " without it, and unable to provide for her basic needs. (*Ibid.*)

nor Mommsen provided recent examples of him denying his mental illness or need for medication.

As A.B. points out, there is no evidence that he was symptomatic at the time of trial to the degree the conservatees in *Walker, Guerrero* and *S.A.* were. But neither was he in the position of those in *Murphy* and *Benvenuto,* cases in which the experts testified that the conservatees were presently capable of providing for their own basic needs. There was no such testimony here: Mommsen testified that A.B. was presently gravely disabled because, due to his lack of insight into his illness and need for medication, he would not continue to take the medication without which he would not be able to provide for himself. Mommsen was fully aware of A.B.'s history and current condition, as he had been treated by her team at the clinic since 2011 and directly by her since 2019.[4] Clay, who was intimately familiar with her son's condition over some 18 years since she first learned of his mental health issues, also believed he did not have insight into his illness and need for medication and would not continue to take the medication without a court order.

Both Clay and Mommsen testified that A.B. had a long history of mental illness, including numerous involuntary detentions and hospitalizations and repeated cycles of decompensating after stopping medication when not under mandatory orders. Prior to the present trial, A.B. had never expressed understanding that he had a mental illness or needed

---

[4] A.B. suggests Mommsen was unfamiliar with his current condition because he had not been meeting with her in person since April 2023, and only infrequently by other means, but this suggestion ignores Mommsen's testimony that she was able to accede to A.B.'s desire not to meet with her in person because he met with her by Zoom and because of the clinic's "team approach" in which she received reports from clinic staff.

medication. He would agree to take oral medication but then decompensate, leading Mommsen to believe he was not taking it, and Mommsen believed A.B. was currently taking his injectable medication only because a court order required him to do so. Clay did not believe A.B. would take his medication without a court order because he had never "never stuck to them on his own" in the past.

A.B. testified he now accepts his diagnosis and need for medication. But his testimony also reflected a lack of understanding of the history and severity of his mental illness. He testified that his most recent hospitalization, in 2023, was the only one of his numerous hospitalizations actually due to mental illness; all the others resulted from his mother inventing untrue stories. He testified that his 2023 hospitalization lasted only a few days, but according to Clay's testimony it was at least three weeks, from the incident on October 27 until an involuntary medication order was issued on November 16. A.B. did not agree with the assertion that he often did not take his medication when given the opportunity to do so voluntarily, but both Clay and Mommsen testified that his consistent pattern was to stop taking his medication without a court order. A.B. denied ever having referred to his medication as "poison," but Clay testified that he "very adamantly" told her this. He testified that he preferred oral medication because he did not have to "commute" to pick it up and did not like being punctured by monthly injections, but he had not opted for twice-yearly injections because he had not "gotten around to" studying the medication.

At the time of trial in March and April 2025, A.B. had been under conservatorship and an involuntary medication order since the October 2023 incident. There was no dispute that he was compliant with medication when a conservatorship and mandatory medication order were in place, although

even then he required reminders to get the monthly injections and Clay drove him to the appointments. The last time he had *not* been under conservatorship and medication orders was after the trial in April 2023, and his decompensation in October was in line with Clay's testimony that he generally decompensated five or six months after stopping medication. In 2021, after being stable on the injected medication while under conservatorship, when the conservatorship terminated A.B. stopped the injections and decompensated, leading to hospitalization.

A.B. testified that this time was different because the October 2023 incident gave him "solid evidence" of paranoia and convinced him he needed medication. While A.B. suggests Clay corroborated his testimony in part when she testified that the October incident was "not typical" of his condition when not taking medication, Clay did not say it was *atypical*—she said it was "[n]ot typical, but one of many forms of behaviors that I have seen when he is not on medication." Mommsen testified that A.B.'s diagnosis of schizoaffective disorder was based "predominantly" on "paranoia and chronic delusions." Clay and Mommsen's testimony thus contradicted A.B.'s in that they viewed his conduct as consistent with the pattern he had repeatedly demonstrated over the years.

The trial court was not required to accept A.B.'s testimony that after over 15 years of denying mental illness, repeatedly discontinuing medication when not under court order and consequently decompensating, he would voluntarily take the medication necessary for him to provide for his basic needs because the October 2023 incident was the "wake-up call" that convinced him the illness existed and he needed the medication. The court expressly credited Clay's and Mommsen's testimony and rejected A.B.'s. contradictory testimony. We defer to the trial court's credibility

23

determinations (*S.A., supra,* 57 Cal.App.5th at p. 55), and there is no basis for us to second guess the trial court's assessment here.

The same is true with respect to the specific issue of A.B.'s ability to provide for his shelter, the chief concern at trial. A.B. argues that there was no evidence contradicting his testimony that he had a plan for obtaining housing, understood the procedure for securing housing at William Penn and would be able to apply elsewhere if William Penn did not work out. Neither Clay nor Mommsen believed A.B. would be able to find and maintain independent housing. A.B. had lived with Clay all his life, save for brief periods. A.B. testified that he had lived in an SRO in the past ("[m]ore than 10 years ago"), was able to manage that situation, and thought he would be able to manage living by himself if he could not live with Clay, but Clay testified that when A.B. had attempted to live in group homes in the past, he would ask to come home, and that in 2008 or 2009 he had become homeless rather than live in a group home. Mommsen testified that renting a room was within A.B.'s capabilities "in the most technical sense," but when this had been attempted in the past he "ultimately [was] not interested" and did not follow through with such plans, and living with Clay was "the only shelter that he wants and that we have been able to get him." Mommsen was also concerned about A.B.'s ability to sustain housing if he was not on medication. This concern was in keeping with Clay's unwillingness to allow A.B. to live at home without an order assuring he would take his medication due to his history of decompensating and becoming aggressive and assaultive.

Further, A.B.'s own testimony gave reason to question his understanding of the practicalities of his plan and ability to execute it. A.B. initially did not understand that Clay would not allow him to live with her without a mandatory medication order, testifying that she had told him he

24

could continue to live at home regardless of the outcome of the hearing. When asked about Clay's testimony to the contrary, A.B. responded, "In that case, I can [rent] an SRO." He had applied to a single SRO hotel two weeks before his testimony, midway through the trial, and did not know how many people were on the wait list ahead of him or how long it might take for a room to become available to him. He believed that if William Penn did not work out, he would be able to rent from one of the "many" other SROs posted online, and that he would have sufficient time to do so before the end of the month (the time for which he had already paid rent to Clay). Mommsen, although not familiar with the waitlist at William Penn in particular, testified that SROs in the Tenderloin generally have long wait lists and "it's hard for us to get people in there."

In short, A.B.'s argument that the trial court improperly based its decision on his inability to live in his first choice of housing except under conservatorship and a mandatory medication order is too narrow a view of the record. Notwithstanding A.B.'s testimony to the contrary, the evidence provided by Clay's and Mommsen's testimony, and credited by the trial court, supports the conclusion that A.B. is presently gravely disabled because, due to his mental illness, he is unable to live at home or secure and sustain alternative housing without medication, and, due to his lack of insight into his illness, he is unable or unwilling to consistently take the necessary medication without a mandatory medication order.

## II.

### *Medication*

" '[A] competent adult has the right to refuse medical treatment,' " including the right to refuse psychotropic drugs. (*In re Qawi* (2004) 32 Cal.4th 1, 14.) A court's determination that a conservatee is gravely

disabled does not, by itself, justify imposing an order allowing involuntary medication. (*Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1312-1313 (*Riese*).)

"Conservators may seek added authority over conservatees, including a limitation on the conservatee's right to refuse medical treatment." (*S.A., supra,* 57 Cal.App.5th at p. 55.) "A court may order involuntary medication if clear and convincing evidence shows the conservatee is incompetent to give or withhold informed consent. (*Riese, supra,* 209 Cal.App.3d at pp. 1322-1323.)" (*Ibid.*) The factors the court must consider in determining whether a conservatee is incompetent "include whether the conservatee lacks mental capacity rationally to understand the nature of the medical problem, the proposed treatment, and its attendant risks." (*Id.* at p. 56; see *In re Qawi, supra,* 32 Cal.4th at p. 18.)

A reviewing court "must determine whether the record contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this clear and convincing standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1009.)" (*S.A., supra,* 57 Cal.App.5th at p. 56.) "We do not reweigh evidence" and "[w]e presume in favor of the judgment the findings of fact necessary to support it." (*Ibid.*)

A.B. argues the evidence does not support finding he did not understand the nature of his illness, proposed treatment and its risks and benefits. He acknowledges the evidence showed he lacked insight into his mental illness prior to the October 2023 incident and questioned his need for medication but reiterates that the incident proved to him that he suffers from paranoia and will decompensate if he does not take his medication. A.B. argues that neither Clay nor Mommsen testified he has denied his mental

illness or need for medication since October 2023. He was aware his medication comes in both oral and injectable forms, as well as that the injectable can be taken either monthly or twice a year. To demonstrate he has the ability to rationally discuss his medication, he points to testimony in which Mommsen described a discussion that resulted in her lowering the dose of his injectable medication and A.B. later contacting her when the pharmacy dispensed the incorrect dose.[5]

As with the issue of grave disability, the issue of A.B.'s competence to consent to give or withhold informed consent to medication in the present case turns primarily on A.B.'s insight into his illness and need for medication. The trial court determined that despite A.B.'s testimony to the contrary, he does not in fact understand the nature of his mental illness and need for medication to prevent decompensation that renders him incapable of providing for his own needs. This finding of lack of insight, which we have concluded is supported by substantial evidence, is critical to the evaluation of A.B.'s competence with regard to decisions about medication. The evidence demonstrates A.B. has repeatedly complied with medication regimens when under conservatorship and mandatory medication orders but stopped taking the medication when such orders were not in place, resulting in decompensation and, according to Mommsen's testimony, some 25 hospitalizations. This history supports the trial court's conclusion that

---

[5] Mommsen testified that in June 2024, A.B. asked to change to oral medication; she did not agree but, as a "compromise," offered to lower his dose of the injectable. A.B. had been released from the hospital on the highest dose possible for this medication and she was comfortable decreasing it to a "maintenance" dose that he had taken for "many, many months in the past." A.B. called her in September because the pharmacy dispensed the higher dose in error.

despite A.B.'s assertion that this time is different, his lack of insight leaves him incompetent to give or withhold informed consent to the medication necessary to treat his mental disorder.

## DISPOSITION

The orders are affirmed.

STEWART, P. J.

We concur.

MILLER, J.

DESAUTELS, J.

*Conservatorship of A.B.* (A173111)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of A.B. | |
| PUBLIC GUARDIAN OF SAN FRANCISCO COUNTY, <br><br>     Petitioner and Respondent, <br><br> v. <br> A.B., <br>     Objector and Appellant. | A173111 <br><br> (San Francisco County <br>  Super. Ct. No. PMH22024757) <br><br> **ORDER CERTIFYING OPINION FOR PUBLICATION** |

**THE COURT:**

The opinion in the above-entitled matter filed on January 12, 2026, was not certified for publication in the Official Reports. For good cause, the request for publication is granted.

Pursuant to California Rules of Court, rules 8.1120 and 8.1105(b), the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.


Dated: _____                    _____
                                                                              STEWART, P.J.

1

Trial Court:  San Francisco County Superior Court

Trial Judge:  Hon. Stephen M. Murphy

Counsel:

First District Appellate Project, Jonathan Soglin, Executive Director and Maria Leftwich, Staff Attorney, under appointment by the Court of Appeal, for Objector and Appellant.

David Chiu, City Attorney, Diana Carbajal-Strait and Elizabeth McDonald Muniz, Deputy City Attorneys, for Petitioner and Respondent.